> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5668-14T4
                A-5729-14T4
                A-5745-14T4

LANE BAJARDI and KIMBERLY
CARDINAL BAJARDI,

      Plaintiffs-Respondents,

v.

NANCY PINCUS, ROMAN
BRICE, and JOHN DOES 1-10,[1]

      Defendants-Respondents.

———————————————

IN THE MATTER OF WHITNEY
GIBSON, ESQ.,

      Appellant.

———————————————

LANE BAJARDI and KIMBERLY
CARDINAL BAJARDI,

---

[1] The John Doe defendants posted allegedly defamatory statements about plaintiffs under "screen names" on various websites. During discovery, the trial court compelled identification of one such individual, Mark Heyer, who entered an appearance and participated in the action through final judgment. It does not appear that the complaint was formally amended to include Heyer.

Plaintiffs-Appellants,

v.

NANCY PINCUS, ROMAN BRICE,
and MARK HEYER,

Defendants-Respondents.

LANE BAJARDI and KIMBERLY
CARDINAL BAJARDI,

Plaintiffs-Respondents,

v.

NANCY PINCUS, ROMAN
BRICE, and MARK HEYER,

Defendants-Respondents.

IN THE MATTER OF JONATHAN
Z. COHEN, ESQ.,

Appellant.

Argued May 9, 2018 – Decided August 2, 2019

Before Judges Nugent, Currier and Geiger.

On appeal from the Superior Court of New Jersey, Law
Division, Hudson County, Docket No. L-3723-12.

William T. Reilly argued the cause for appellants Whitney Gibson, Esq. and Vorys, Sater, Seymour and Pease, LLP, in A-5668-14 (McCarter & English, LLP, attorneys; William T. Reilly, of counsel and on the brief).

Francis X. Garrity argued the cause for appellants Lane Bajardi and Kimberly Cardinal Bajardi in A-5729-14 (Garrity, Graham, Murphy, Garofalo & Flinn, PC, attorneys; Thomas D. Flinn, of counsel; Jane Garrity Glass, on the brief).

Marshall D. Bilder argued the cause for appellant Jonathan Z. Cohen, Esq., in A-5745-14 (Eckert Seamans Cherin & Mellott, LLC, attorneys; Marshall D. Bilder and Jason S. Feinstein, of counsel and on the brief).

Kerry Brian Flowers argued the cause for respondent Mark Heyer in A-5668-14, A-5729-14, and A-5745-14 (Flowers & O'Brien, LLC, attorneys; Kerry Brian Flowers and Michele A. Daitz, of counsel and on the briefs).

Stephen R. Katzman argued the cause for respondent Nancy Pincus in A-5729-14 (Methfessel & Werbel, attorneys; Stephen R. Katzman, of counsel and on the brief; Christian R. Baillie, on the brief).

Alexander W. Booth, Jr. argued the cause for respondent Roman Brice in A-5729-14, and joined in the briefs of respondent Mark Heyer in A-5668-14 and A-5745-14.

PER CURIAM

A-5668-14T4

In these back-to-back appeals, which we consolidate for this opinion, plaintiffs appeal from a series of orders dismissing their defamation action, and they and their attorneys appeal from orders awarding counsel fees to defendants and imposing sanctions. The backdrop is the contentious political climate that existed in Hoboken from 2009 through 2012. During that time, through July 2011, plaintiff Lane Bajardi (Bajardi) emerged as a not infrequent and often outspoken participant at city council meetings and some board of education meetings, where he routinely criticized officeholders aligned with a political faction he opposed.

Defendant Nancy Pincus, a self-described "political-satirist blogger," who supported the incumbent mayor during the relevant period and harshly criticized the opposing political faction, was frequently the target of Bajardi's criticism.[2] Defendants regularly posted commentary on various internet sites about Bajardi

_____

[2] "A blog is a type of personal column posted on the Internet. . . . Some blogs are like an individual's diary while others have a focused topic, such as recipes or political news." Too Much Media, LLC v. Hale, 206 N.J. 209, 219 n.1 (2011) (alteration in original) (internal citation omitted).

A-5668-14T4

and his wife, plaintiff Kimberly Cardinal Bajardi (Kimberly), who also supported the political faction that opposed the incumbent mayor.[3]

Between June 2011 and July 2012, defendants posted more than thirty blogs about plaintiffs, falsely accusing them of continuing their participation in politics and internet exchanges by posting under new screen names. With two exceptions, these blogs were posted after plaintiffs had ceased all participation in Hoboken civic and political affairs. Pincus also sent an email to Bajardi's employer, falsely accusing Bajardi of authoring what she deemed an anti-Semitic post to an internet site. Alleging the postings between June 2011 and July 2012 were defamatory, plaintiffs filed the lawsuit from which this appeal stems.

Plaintiffs appeal from the summary judgment dismissal of the majority of their defamation claims, from several rulings at trial resulting in the dismissal of their action at the close of their evidence, and from the post-trial order requiring them to pay more than a quarter million dollars in counsel fees. In the other two appeals, plaintiffs' attorneys – one who filed the complaint and

---

[3] We use plaintiff Kimberly Cardinal Bajardi's first name to differentiate her from her husband. We mean no disrespect.

represented plaintiffs during some of the pretrial proceedings, the other who represented plaintiffs during the remaining pretrial proceedings and at trial – appeal from orders requiring them to pay sanctions. Because two of plaintiffs' claims presented disputed facts that should have been resolved by a jury, and because the trial court erred by awarding counsel fees, we reverse and remand for further proceedings.

I.

A.

Although the arguments plaintiffs present on appeal do not challenge the outcome of many of the dispositive pretrial motions defendants made, the motions are relevant to the trial judge's imposition of frivolous claims fees and sanctions. For that reason, we recount most of the pretrial proceedings.

On July 26, 2012, plaintiffs filed a complaint in which they alleged that on different and separate occasions between June 8, 2011, and July 19, 2012, defendants posted on internet websites more than thirty defamatory statements about them. According to the complaint, Pincus posted twenty-one, Brice three, the John Doe defendant later identified as Heyer six, and John Doe defendants

identified by their screen names (the Screen Name defendants), four.[4]  Plaintiffs also alleged Pincus sent a defamatory email to Bajardi's employer.  When plaintiffs filed the complaint, Whitney Gibson, Esq., admitted pro hac vice, and Amy Cox, Esq., a New Jersey attorney, represented them.

Before filing answers, Pincus and Heyer sent letters to Gibson under Rule 1:4-8, requesting dismissal of the complaint.  On September 26, 2012, Pincus's then-counsel asserted in a letter the litigation was a SLAPP suit,[5] initiated for the improper purpose of harassing Pincus, creating needless litigation costs, and chilling legitimate political speech.  Counsel explained why the causes of action were unsupported by facts or the law, and advised that if plaintiffs did not withdraw the complaint, Pincus would apply for sanctions.

A few weeks later, on October 15, 2012, Heyer's counsel sent a Rule 1:4-8 letter to Gibson, claiming to represent individuals who posted under various screen names mentioned in the complaint, and demanding the complaint be withdrawn.  Counsel claimed the litigation was a SLAPP suit intended to silence

---

[4]  The content of the defamatory statements, as set forth in the complaint, are attached as Exhibit A and numbered according to the paragraphs that correspond to the complaint.

[5]  Strategic Lawsuit Against Public Participation.  LoBiondo v. Schwartz, 199 N.J. 62, 72 (2009).

political speech. Counsel further claimed that plaintiffs' causes of action were without factual or legal merit, arguing that the alleged statements were not actionable as defamation given the subject matter of the statements and the context in which they were made. Counsel noted plaintiffs' work on behalf of a particular candidate and their involvement in Hoboken's political affairs, which rendered them public figures.

On October 23, 2012, Gibson responded to Pincus's letter. Gibson explained that plaintiffs' claims were made in good faith, and not for an improper purpose. He further explained that the claims were not frivolous, setting forth the factual and legal bases for the causes of action. Finally, he denied that plaintiffs were public figures, but stated that even if they were they could succeed on the defamation claims because defendants made their statements with reckless disregard for the truth.

In November 2012, Pincus and Brice filed answers to the complaint, and in January 2013, Pincus moved for summary judgment. The first pretrial judge granted the motion in part and dismissed three allegedly defamatory statements as time-barred but determined that genuinely disputed issues of material fact precluded summary judgment as to the remaining statements. The Appellate Division denied Pincus's motion for leave to appeal.

Later that year, in November 2013, Gibson and Cox withdrew as plaintiffs' counsel. Jonathan Z. Cohen, Esq. represented plaintiffs through trial.

The following month, on December 22, 2013, Pincus wrote to Cohen and asked that plaintiffs dismiss the litigation as frivolous under Rule 1:4-8. She attached her former attorney's September 26, 2012 letter, as well as some discovery materials.

Thereafter, on April 11, 2014, the first pretrial judge granted in part and denied in part Brice and Heyer's Rule 4:6-2(e) motions to dismiss the complaint for failure to state a cause of action. The judge dismissed four paragraphs that identified allegedly defamatory statements and a fifth paragraph that alleged defendants may have posted defamatory statements under twelve enumerated screen names. In his decision, the judge found potential merit in certain allegations in the complaint.

Two months later, in June 2014, the first pretrial judge granted plaintiffs' motion to compel identification of whoever was using the screen names "ThisMeansWar" and "JackStop". Significantly, the judge remarked on the potential merits of plaintiffs' claims.

The following month, after filing a summary judgment motion as well as an unsuccessful motion for a stay, Heyer acknowledged he used the screen

names ThisMeansWar and JackStop, answered the complaint, and counterclaimed for a violation of the Frivolous Litigation statute, N.J.S.A. 2A:15-59.1. Plaintiffs filed a motion to dismiss the counterclaim, which a second pretrial judge granted.

Next, Pincus and Brice filed motions for summary judgment. Heyer's was still pending. On August 22, 2014, while the three summary judgment motions were pending, Heyer's counsel sent a letter to Cohen under Rule 1:4-8, referencing his October 15, 2012 letter to Gibson, as well as Pincus's September 26, 2012, letter to Gibson, which he enclosed. Counsel asked that plaintiffs withdraw the complaint, charging that it was a frivolous SLAPP suit, filed for the improper purpose of harassing Heyer and chilling his First Amendment rights. Cohen denied ever receiving this letter.

In September, the second pretrial judge granted the summary judgment motions (the September motions) in part, dismissing most of the remaining claims, leaving for trial only several of Bajardi's claims against Pincus, Brice, and Heyer. The judge also made these rulings: (1) Bajardi was a limited purpose public figure based upon his involvement in Hoboken's contentious factional politics; and (2) the subject of defendants' allegedly defamatory statements, Hoboken's political factionalism, was one of public concern. In view of these

rulings, Bajardi would be required at trial to prove defendants made the alleged defamatory statements with "actual malice," that is, with knowledge of their falsity or with reckless disregard of whether they were false. The judge determined the jury would have to decide this factual dispute, that is, whether defendants made the alleged statements with actual malice.

The dispositive motion practice continued. In November 2014, Heyer filed another summary judgment motion, which the second pretrial judge denied. In December, Pincus and Brice filed summary judgment motions. On December 12, 2014, with the motions pending, Brice's counsel sent a letter to Cohen demanding under Rule 1:4-8 that plaintiffs withdraw the complaint against Brice. Counsel called the lawsuit a SLAPP suit and an abuse of process.

A week later, on December 19, 2014, the second pretrial judge denied the latest summary judgment motion filed by Heyer, and two weeks later, on January 9, 2015, a third pretrial judge denied the latest summary judgment motion filed by Brice.

The case was tried in January and February 2015. Following the close of plaintiffs' evidence, the trial judge dismissed the complaint's remaining allegations on defendants' motion for judgment under Rule 4:40-1. Thereafter, defendants moved for counsel fees and sanctions under N.J.S.A. 2A:15-59.1 and

Rule 1:4-8.  The trial judge granted the motions.  These appeals followed.

B.

During discovery and the extensive pretrial motion practice, the parties developed the following background facts.  Bajardi began working in radio broadcasting at age sixteen and became a professional journalist in 1987.  From February 2009 through September 2011, he was unemployed but continued to receive income from his severance package.  In September 2011 – two months after ceasing all participation in Hoboken political and civic affairs – Bajardi began working for CBS at its radio station, 1010 WINS.  He started as a freelance journalist.  By the time the defamation trial commenced, he was a news anchor on an overnight shift.

Bajardi and Kimberly moved to Hoboken in 2001.  Four years later, in 2005, Bajardi became interested in Hoboken politics and the proposed construction of a high-rise building near his fifth-floor walk-up apartment.  He began attending city council meetings, and he rallied people in his neighborhood against the proposed development.  He also attended board of education meetings occasionally.  He volunteered on numerous political campaigns, working to elect politicians he believed would support matters of importance to him.

A-5668-14T4

Among the politicians Bajardi eventually supported and volunteered for were Beth Mason, Tim Occhipinti, and Peter Cammarano. Cammarano, who was elected mayor in 2009, was arrested within thirty days of taking office. He later pled guilty to federal charges for accepting bribes. Dawn Zimmer, who Bajardi opposed, succeeded Cammarano as mayor. Pincus supported Mayor Zimmer.

In addition to the scandal involving Cammarano, Patrick Ricciardi, a former Hoboken employee and systems information specialist, resigned in May 2011. He was later convicted of federal crimes for intercepting Mayor Zimmer's emails.

Bajardi volunteered for several campaigns, including a bid by Mason for mayor, but was never paid. He ended his involvement in Hoboken politics in July 2011. He stopped attending board of education meetings in 2009 or 2010, last worked voluntarily for a city council campaign in May 2011, and stopped attending city council meetings in July 2011.

During his years of political involvement, Bajardi participated in online conversations regarding Hoboken politics. In particular, he wrote articles for the website Hoboken411.com, albeit without credit for authorship. He also posted comments on other websites, according to him to counteract what others

had written about Mason. When doing so, he used the screen name Redhaven but never the screen name prosbus. Bajardi stopped posting online comments when he withdrew from the Hoboken political scene in July 2011.

To Bajardi's knowledge, he first became a target for criticism on Hoboken blogs in 2009. Pincus, in particular, targeted him in her online posts. She disliked Bajardi, posting in June 2011 that "[n]othing I do is personal or intentionally cruel. (Except for Mason and Bajardi – and I freely admit it.)."

Kimberly worked in cable television news from 1989 to 2009, starting as a Desk Assistant and finishing as an Editorial Producer. She left her job to become a stay-at-home mother. During the period that Pincus, Brice, and Heyer posted their allegedly defamatory comments, Kimberly did not "blog." In her interrogatory answers she said, "I have never blogged – period."

Like Bajardi and their neighbors, in 2005, Kimberly became involved in a "grassroots effort to make [their] voices heard in regards to the potential development of the Municipal Parking Garage," which threatened the enjoyment of their homes. Kimberly attended city council meetings, but she did so for the last time in November 2008 – more than two years before Pincus, Brice, and Heyer began posting the blogs that are the subject of this appeal. She did, however, work for certain campaigns. Discovery revealed that she once

14

discussed with opponents of Mayor Zimmer whether a certain tactic would embarrass the Mayor publicly.

According to Kimberly, in 2006, blogs emerged as a medium for Hoboken residents to express their views about politics and other matters. She observed that in 2009 the discourse on these blog sites "took a particularly nasty turn, taking the civil discussions to a new level of personal attacks."

Pincus, an architect, moved to Hoboken in 1996. In 2008, she began to attend board of education meetings, "concerned about the priorities of the Superintendent and allied Board majority and suspect[ing] misappropriation of resources." For those and other reasons, she supported three candidates who opposed the incumbents in the 2009 school board election. These candidates, who won, ran on a "Kids First" ticket aligned with the "Reform" political camp in Hoboken, which Pincus supported. On December 9, 2009, City Council appointed Pincus to the Zoning Board of Adjustment.

Pincus had observed Bajardi "appearing regularly at the City Council and Board of Education . . . meetings for years." She and Bajardi became what she described as "adversaries with diametric political allegiances." She admittedly "support[ed] Hoboken Mayor Zimmer and [was] a harsh critic of Hoboken Councilwoman Beth Mason."

Pincus claimed that the day after city council meetings a "detailed and anonymous write-up" would appear on a website called Hoboken411.com. She also claimed that Bajardi's "tone and talking points at the City Council and the colorful prose on Hoboken411 were identical." For that reason, she suspected Bajardi was ghostwriting for the website and using pseudonyms "for online postings in that same unmistakable voice."

Pincus averred in an affidavit that "Reform participants in Hoboken's political blogosphere" also believed Bajardi was ghostwriting for Hoboken 411.com. She cited other internet posts and a former council member's remarks at a televised meeting as evidence. The statement of the council member provides one perception of Bajardi's public and suspected internet commentary. He said Bajardi had "done more than any other human being in this city to lower the standard of public debate[.]"

Pincus routinely attacked Bajardi in her internet postings. She also attacked Kimberly, whom she suspected of being Bajardi's "silent, behind-the-scenes partner."

Brice and Heyer supported some of Pincus's views. They posted to her blog site. Some of their posts were critical of Bajardi and Kimberly. Bajardi and Brice once engaged in a verbal disagreement and shoving match that

16

resulted in their filing criminal complaints against each other.

Against that backdrop, plaintiffs filed their complaint. The complaint includes 174 paragraphs. The first seven paragraphs identify the parties, state the John Does are "natural persons, and/or corporations or business entities, whose specific names and residences are unknown," and assert defendants made defamatory statements about plaintiffs on the internet and interfered with plaintiffs' business relations. Paragraph seven alleges the unnamed "John Doe" defendants have refused to identify themselves and have taken affirmative steps to conceal their identities.

Paragraphs ten to sixteen purport to provide the "factual background" for the complaint. They identify plaintiffs' occupations and provide some background information about them. Paragraph fourteen asserts that Pincus "is the owner and operator of GrafixAvenger blogspot and posts to the internet under the pseudonym Grafix Avenger." Paragraph fifteen asserts that Pincus is a member of Hoboken's Zoning Board of Adjustment and in that capacity takes official actions on behalf of the City. Paragraph sixteen states that Brice is the editor of "The Hudson Mile Square View" and posts to the internet under the pseudonym "hobokenhorse."

Paragraph seventeen alleges Pincus, Brice and the unnamed defendants posted false and disparaging comments about plaintiffs on various websites, including hoboken.Patch.com, GrafixAvenger.blogspot.com, Galloway.Patch.com, and nj.com, among others. Beginning with paragraph eighteen, and in every other third or fourth paragraph thereafter, the complaint purports to quote a specific defamatory internet post, followed by two or three explanatory paragraphs. The following are examples:

> 22. Upon information and belief, on or about June 16, 2011, Pincus posted comments concerning [p]laintiffs on the website grafixavenger.blogspot.com, including, but not limited to the following:
>
>> Lane Bajardi let out of his holding cell in Newark, all wired-up and no place to go – was there last night, dapper in a dark suit, excited to see me. So excited he told the handsome, young gentleman next to him who I was. That young man then stood up and snapped pic after pic of me with his cell phone from his side of the gallery. . . . Nothing I do is personal. Or intentionally cruel. (Except for Mason and Bajardi – and I freely admit it.)
>>
>> . . . .
>
> 24. The statements are false and defamatory because they imply that Mr. Bajardi is serving as a cooperating witness for the FBI. Mr. Bajardi is not under investigation by the FBI, has never been in the custody of the FBI, is not a witness for the FBI, and is not

18

A-5668-14T4

involved in any criminal activity. Mr. Bajardi also did not direct anyone to take photos of Ms. Pincus. Finally, this comment demonstrates Pincus' malicious intent to harm [p]laintiffs.

. . . .

31. Upon information and belief, on or about August 25, 2011, Pincus posted false and defamatory comments concerning [p]laintiffs on the website grafixavenger.blogspot.com, including but not limited to the following:

> City Council regular for years, Beth Mason operative Lane Bajardi . . . . Bajardi has been lashing out on Patch and Hudson Reporter forums. To boot, he's ditched his "known" screen names, commenting under a variety of new ones, with rants as identifiable as a finger print [sic].
>
> Ha! It looks like I spoke too soon . . . the Mason checkbook seems to have flipped open to throw a certain cyber-slug a bone. Yes, he's published another putrid Bajardi screed. FBI, they're at it again. Persons-of-interest, enjoy the time you have left. *Unshackled.*

32. The post above is followed by a photograph of Mr. Bajardi and former Hoboken Mayor, and convicted felon, Peter Cammarano with the caption "Birds of a Feather."

. . . .

34. The statements are false and defamatory because Mr. Bajardi is not an FBI person of interest, and is not

19

involved in criminal activity. Further, Mr. Bajardi is not a political operative, is not paid by Ms. Mason, does not anonymously post to the hoboken.Patch.com website, and did not post any comments referenced by the statements.

35. Upon information and belief, on or about November 7, 2011, Brice posted false and defamatory comments concerning Mr. Bajardi on the website hoboken.patch.com, including, but not limited to the following: "Lane Bajardi is back. Still fighting for the corrupt and The Machine for his Beth Mason paycheck. Yawn. Same ole, same ole."

. . . .

37. The statements are false and defamatory because Mr. Bajardi does not associate with corrupt individuals, and is not paid by Ms. Mason. The statements falsely imply involvement in criminal activity.

. . . .

44. Upon information and belief, on or about January 13, 2012, an Unnamed Defendant posting under the pseudonym ThisMeansWar, posted false and defamatory comments concerning [p]laintiffs on the website hoboken.patch.com, including, but not limited to the following:

> Has it occurred to Lane Bajardi that he may be looking at hefty prison time? He has NEVER appeared in an ELEC report for Beth Mason or Tim Occhipinti. He appears in this midnight video for Occhipinti's campaign leaders . . . . Is he credited in Bath Mason's IRS filings? Does he credit her in his tax forms?

20

. . . .

46.    The statements are false and defamatory because Mr. Bajardi is not a political operative, and is not paid by Ms. Mason or Tim Occhipinti.  Mr. Bajardi does not have any income from either person that needs to be reported to the IRS, and thus does not face prison time, or even possible prison time, for such activities.  By referring readers to an FBI website explaining that organization's "internet tip line," the Unnamed Defendant encourages readers to report Mr. Bajardi to the FBI, harming his reputation and employment prospects.  The statements falsely imply involvement in criminal activity.

47.    On or about January 18, 2012, Pincus emailed false and defamatory comments concerning [p]laintiffs to Mr. Bajardi's employer, including, but not limited to the following:

> Lane Bajardi is a hyper-partisan political operative who blogs under the screen name 'prosbus,' and is now fomenting anti-Semitism in his latest effort to smear Hoboken's Jewish mayor, Dawn Zimmer. As a Jew, I am offended and disgusted by this.  As a well-known political blogger in Hoboken, I will be asking my community to reject Mr. Bajardi and his hate-mongering.  I don't think your advertisers will appreciate a voice on your airwaves actively engaged in spreading bigotry and intolerance in the Hoboken community . . . .  Here are (2) of Mr. Bajardi's posts attached, in case he has them deleted first[.]

21

48. The above quote is followed by screen shots supposedly representing blog entries by someone writing under the pseudonym prosbus. The email is attached at Exhibit 1.

49. The statements are false and defamatory because Mr. Bajardi – who is Jewish – is not anti-Semitic, nor has he posted anything anti-Semitic, or anything attacking other ethnic or religious groups. Further, Mr. Bajardi is not a political operative, and does not post to the internet under the pseudonym prosbus.

50. The email also harms Mr. Bajardi's relationship with his employer. It encourages CBS to terminate Mr. Bajardi's employment through its threat to harm 1010WINS radio's listenership. Mr. Bajardi's supervisor, who has the ability to terminate Mr. Bajardi's employment, was made aware of the email.

51. When asked by CBS to prove that Mr. Bajardi posted under the pseudonym prosbus, Ms. Pincus never responded.

As previously noted, most of the allegedly defamatory statements were dismissed on motions before trial after judges found them to be facially non-defamatory. The few not dismissed on pre-trial motions were dismissed at trial.

The case proceeded to trial against Pincus, Brice, and Heyer, based on allegedly defamatory statements delineated in several paragraphs of the complaint. The statements were based on posts falsely attributed to Bajardi, as Bajardi had stopped posting. Collectively, the statements asserted Bajardi was a political operative, painted him as being corrupt, and accused him of having

engaged in criminal activity. Bajardi presented the following evidence as to these posts.[6]

After testifying about his background and how he became involved in Hoboken politics, Bajardi denied being paid for working on any of Mason's campaigns. He denied being "a Beth Mason operative." Mason testified that she never compensated Bajardi in any way for his services. Bajardi acknowledged, however, Mason was once fined for not reporting all of her political expenses with respect to her 2009 mayoral campaign.

Similarly, Occhipinti testified that Bajardi was merely a volunteer on one of his campaigns, and both Cammarano and Occhipinti testified that to their knowledge Bajardi was not involved in any corrupt or criminal activities. Cammarano added that neither Pincus nor Brice ever contacted him to obtain information about his criminal conviction.

Bajardi emphasized that his involvement in Hoboken politics ended in July 2011. Concerning the allegedly defamatory statements made about him by defendants, Bajardi testified that there were a number of internet blogs or websites focused on Hoboken politics. In addition, individuals sometimes commented on Hoboken politics in the comment sections of other websites. The

---

[6] Bajardi called defendants as witnesses in his case.

comments were posted under screen names.

Pincus operated one Hoboken-focused blog, GrafixAvenger.blogspot. com. Pincus admitted that: she did not like Bajardi; she once sent an email to his boss, criticizing him; she wrote in posts that plaintiffs were bad parents who should be reported to child protective services; she stated in posts that plaintiffs had serious personality disorders; and in her posts, she referred to plaintiffs as "Mr. and Mrs. Melanoma."

Brice operated another Hoboken-focused blog, Hudson Mile Square View. Bajardi testified about the incident with Brice that resulted in the mutual filing of criminal charges.

Bajardi explained that during his years of political involvement, he participated in online conversations regarding Hoboken politics. He wrote articles for the website Hoboken411, albeit without credit for authorship. He also posted comments on other websites, under the screen name, Redhaven, to counteract what others had written about Mason; but never under the screen name prosbus.

Bajardi stopped posting online comments when he withdrew from the Hoboken political scene in July 2011. He did so, in part, "to separate [him]self from . . . this constant barrage of attacks [he] was receiving from individuals

A-5668-14T4

online and otherwise."

Bajardi recalled he first became a target for criticism on Hoboken blogs in 2009. Pincus, in particular, targeted him in her online posts, with apparent animus, writing in June 2011 that "nothing I do is personal. Or intentionally cruel. (Except for Mason and Bajardi – and I freely admit it.)."

After Bajardi withdrew from Hoboken politics in July 2011, Pincus noticed. In a post dated August 15, 2011, Pincus wrote:

> City Council regular for years, Beth Mason operative Lane Bajardi – famous for choreographed City Council performances coordinated with self-authored hit pieces in Hoboken411.com and scripted Mason outrage – has been MIA at public meetings. Severed from Hoboken411.com and neutered at the City Council, Bajardi has been lashing out on Patch and Hudson Reporter forums. To boot, he's ditched his 'known' screen names, commenting under a variety of new ones, with rants as identifiable as a finger print. GA thinks the motive for using so many screen names is to create the perception that the 'message' is shared by many messengers. In fact, it's one person blowing a lot of smoke.
>
> . . . .
>
> Ha! It looks like I spoke too soon . . . the Mason checkbook seems to have flipped open to throw a certain cyber-slug a bone. Yes, he's published another putrid Bajardi screed.
>
> FBI, they're at it again.

25

> Persons-of-interest, enjoy the time you have left. Unshackled.

According to Bajardi, the statement was false, as he was not a "Beth Mason operative," nor was he ever paid by Mason. For her part, Pincus admitted that she knew at the time of this post that none of Mason's ELEC[7] reports indicated any payments to Bajardi, and she admitted that she did not contact Mason or Bajardi to check the accuracy of her statements.

In another blog post, on January 25, 2012, Pincus wrote:

> I had to laugh at the mournful post of CuriousGal, who does not deny being Kim Cardinal, the political operative wife of political operative Lane Bajardi, who has not denied posting as prosbus . . .
>
> Mr. and Mrs. Melanoma, defenders of corruption, haters of the clean, progressive Kids First majority School Board.

Pincus did not contact Bajardi to confirm the accuracy of these statements. However, she knew at the time she wrote this post that he was working as a news anchor for CBS radio, he had not attended a city council meeting since July 2011, and he had stopped ghostwriting articles for Hoboken411.com.

In another allegedly defamatory post, written on February 3, 2012, in the comments section of an article posted on galloway.patch.com, Pincus wrote:

---

[7] Election Law Enforcement Commission.

CuriousGal (Kim Cardinal) is a hideous political operative whose husband has worked for years on the campaigns of a wealthy local Councilwoman named Beth Mason, yet Bajardi has never appeared on a Mason ELEC report – meaning perhaps lots of undeclared income to the IRS. Oops!

. . . Mr. Bajardi, blogging here as VinVan has been questioned by the FBI, and is believed to be part of the criminal conspiracy to steal our mayor's e-mail and traffic[k]ing [in] confidential city information. A friend of Bajar[d]i's named Patrick Ricciardi, has been arrested. More arrests will follow. Don't be surprised if you read about him in the paper. . . .

Pincus testified that she wrote the comment to protect the reputation of a former Hoboken business administrator, in response to comments made by someone using various screen names, whom she believed to be Bajardi. She admitted that when she wrote the comment she had no knowledge of Bajardi's having been questioned by the FBI, or of his having been involved in the theft of emails, and she did not question him, Ricciardi, the FBI, or the U.S. Attorney's office to verify the accuracy of her statements.

Bajardi and Ricciardi testified that Pincus never sought an interview with either of them about her statements. Moreover, both men testified that Bajardi had nothing to do with the theft of the mayor's emails, a crime for which Ricciardi was convicted. Bajardi testified he was never questioned by the FBI about any matter.

27

On cross-examination, Bajardi admitted that nine emails to and from former Hoboken Mayor Zimmer had been forwarded to him as an email attachment in February 2011, and were found on his email account during discovery. He denied opening the attachments or reading the emails until they were produced during discovery, and he denied any knowledge that the attached emails had been stolen. In his testimony, Ricciardi explained that the nine emails found on Bajardi's email account were not ones he had stolen.

In another allegedly defamatory posting, on March 16, 2012, Pincus wrote on her GrafixAvenger blog:

> Guess WHO showed up to . . . umm . . . defend the person he's not supposed to be- at least according to the corporate owner of 1010 WINS, CBS[?]
>
> prosbus.
>
> It was overdue, frankly.
>
> His wife Kim Cardinal was getting pounded, forced to fend off the onslaught of commenters asking the obvious: was Lane Bajardi unwittingly used to aid and abet the corruption of Hoboken's zoning adjustment authority or was he Cammarano's willing pitchman in this corruption?
>
> G.A. can personally attest to Bajardi's long war on a fair and honest official — myself. Now that we've discovered his alliance with Cammarano for control of the zoning adjustment authority (which Cammy sold to Dwek just days earlier) it puts Bajardi's lust for my seat

28

in it's proper perspective; ingratiating himself with corrupt and powerful individuals is what it's been about.

Take a look at who he and the Mrs. are siding up to these days. Al Arezzo.

Case closed.

Today, prosbus is in a bit of a bind. He can't 'defend' or 'explain' the actions of Lane Bajardi without stepping out from behind his screen name. It's delicious.

But he did finally show up — to suggest the Cammarano-Bajardi disclosure was "undocumented hearsay" from a "biased source" (GA).

So here's his comment with my response below.

Bajardi explained that Pincus never contacted him to verify the accuracy of her post, and the post was false, as he never posted on the internet using the screen name prosbus, he was not Cammarano's pitch man for corruption, and he was not involved in an alliance with Cammarano for control of the zoning adjustment authority. He admitted that he endorsed Cammarano as a candidate for mayor. However, he did not know at the time Cammarano intended to sell zoning variances, and he was shocked when Cammarano was arrested.

Pincus testified that the post was based upon her reasonable beliefs, and not upon facts established through investigation. She admitted she did not contact Bajardi or Cammarano regarding her statements.

Regarding Brice's allegedly defamatory statements, in a November 7, 2011 comment on hobokenpatch.com, Brice wrote:

> Lane Bajardi is back.  Still fighting for the corrupt and
> The Machine for his Beth Mason paycheck.  Yawn.
>
> Same ole, same ole.

Bajardi testified that the statement was false, as he did not fight for the corrupt and "the machine," or for a Beth Mason paycheck.

Brice testified that he believed Bajardi had been commenting on the same thread, and his comment was responsive and meant to be humorous;  a joke about Bajardi's involvement in the political discourse in Hoboken.  In particular, Brice was referring to Bajardi's involvement on a number of political campaigns, and his support for Cammarano, Occhipinti, and Mason, and the status quo in Hoboken politics (the machine) as opposed to the reformers.

Brice admitted that he never asked Bajardi or Mason whether Mason paid Bajardi for his services.  Moreover, when he posted this comment, Brice had not viewed Mason's ELEC reports, and when he ultimately did view the ELEC reports they did not show any payments to Bajardi.  In short, Brice admitted he had no evidence Bajardi was ever paid by Mason.  Nevertheless, he believed Bajardi was paid by Mason based upon his observation that Mason spent a lot of money on her campaigns, and because Bajardi worked strenuously on

Mason's behalf.

In another allegedly defamatory comment, made on June 8, 2012, on a comment thread relating to a May 21, 2012 article on the Hoboken Patch website, Brice wrote under the screen name hobokenhorse:

> No matter what Beth Mason's other paid political operative Lane (prosbus/Madison Monroe/et al) Bajardi has to say about his fellow Mason paid political operative Matt Calicchio, the judge's comments speak for themselves even if the prosecutor lacked evidence for a conviction.

Bajardi testified the statement was false, as he was never a political operative, nor was he paid by Mason. Furthermore, Brice never contacted him to verify the accuracy of his comment.

Brice testified that: he wrote the comment as part of the extensive political discourse generated by a news article; he was commenting on Matt Calicchio's alleged harassment of a woman and her child outside a board of education meeting; and the comment, when viewed in its entirety, was intended as satirical humor.

Brice believed both Bajardi and Calicchio were political operatives based upon their involvement in Mason's campaigns. However, he knew at the time of his comment that Bajardi did not appear in any of Mason's ELEC reports. Brice also admitted that when he made the comment he "might have heard" that

Bajardi was working for 1010 WINS, although he "really wasn't sure."

With respect to Heyer's allegedly defamatory statement, in a February 3, 2012 post on the Galloway Patch website Heyer, using the screen name ThisMeansWar, wrote:

> Hello Galloway. Just a quick note on our "contributors" from Hoboken. VinVan, prosbus, CuriousGal (and other names they may use as the night goes on) are the husband and wife PAID OPERATIVE team of Lane Bajardi and Kim Cardinal. Bajardi and Cardinal are extremely closely aligned with (PAID BY) the political machine in Hoboken. You can rather quickly and easily verify that yourselves. . . . You may recall from FBI surveillance tapes where he [Russo] accepted a bribe from Solomon Dwek and told Dwek to make it out to RussoForHoboken. Bajardi and Cardinal have spent many an hour defending Mr. Russo's behavior. . . . Ms. Mason is the exceeding wealthy bankroller of smear campaigns against political enemies (many of which were penned by Mr. Bajardi)    . . . . She has spent millions in her own (husband's) money in a failed quest to get elected mayor (much to the chagrin of Mr. Bajardi who would have been her Public Information Officer). . . .

Bajardi testified that the statement was false.

For his part, Heyer believed it likely that Bajardi was paid by Mason. However, he admitted that he had no evidence Bajardi was paid for any of his political activities. Heyer also admitted knowing at the time of his comment that Bajardi did not appear in any ELEC reports, and he admitted that he

performed no interviews of relevant individuals to determine if Bajardi was paid.

In terms of personal animus, Heyer denied hating plaintiffs. At the same time, he admitted writing that they were "future convicted felons," and "paid liars," and they were damaging their child.

Concerning damages, plaintiffs' counsel advised the court that Bajardi was attempting to prove defamation per se, and was seeking only presumed, nominal damages, as opposed to actual, pecuniary damages.

The trial ended when the court granted defendants' motion for judgment at the close of the evidence. Following additional proceedings culminating in the award of counsel fees to defendants, plaintiffs appealed.

## II.

We first address plaintiffs' arguments concerning the September motions. Plaintiffs argue the second pretrial judge erred in dismissing all allegedly defamatory statements concerning Kimberly and most others concerning Bajardi. Plaintiffs also argue the judge erred in determining Bajardi was a limited purpose public figure and that Hoboken political factionalism was sufficiently specific to qualify as a matter of public concern.

Specifically, plaintiffs contend the judge committed four errors. First, the judge failed to recognize that defendants' statements identifying the Bajardis as

"prosbus" and "CuriousGal" were capable of a defamatory meaning; many readers found the posts under those screen names to be offensive, believed plaintiffs had written them, and ridiculed plaintiffs as a result. Second, the judge improperly dismissed claims that were defamatory per se in that they accused plaintiffs of criminal activity and occupational misconduct. Third, defendants argued the judge applied an overly broad analysis when she identified "contentious factionalism present in Hoboken politics" as a sufficiently "particular controversy" to which Bajardi had a connection, thereby making him a "limited purpose public figure." Fourth, the judge applied an overly broad analysis and mistakenly concluded that "Hoboken political factionalism" was a "matter of public concern."

Defendants counter that the statements identifying plaintiffs as prosbus and CuriousGal are not susceptible of a defamatory meaning because statements in other writings made by plaintiffs were "completely consistent" with statements made by the two persons posting under the screen names prosbus and CuriousGal. Defendants contend plaintiffs' claims for defamation per se fail because, as a matter of law, that cause of action is not available when a matter of public interest is involved. In addition, defendants insist the second pretrial judge correctly determined that Bajardi was a limited purpose public figure and

that Hoboken political factionalism was sufficiently specific to constitute an issue of public importance.

A.

We review the second pretrial judge's order on the September motions "in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citations omitted). Our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); accord, R. 4:46-2(c). We owe no special deference, however, to a trial court's determination that a party is entitled to summary judgment as a matter of law. That determination is subject to de novo review. Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (citation omitted).

B.

"Defamation law balances two competing interests – an individual's right to protect his reputation from unjustified and false aspersions and our citizens' right to free expression and robust debate in our democratic society." Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 243 (2018). To succeed on a defamation claim, a plaintiff must prove the following elements: "(1) that

defendants made a false and defamatory statement concerning [plaintiff]; (2) that the statement was communicated to another person (and not privileged); and (3) that defendants acted negligently or with actual malice." G.D. v. Kenny, 205 N.J. 275, 292–93 (2011) (citing DeAngelis v. Hill, 180 N.J. 1, 13 (2004). "The actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern." Senna v. Florimont, 196 N.J. 469, 496 (2008). To prove actual malice, a plaintiff must establish by clear and convincing evidence that the defamatory statement was published "with knowledge that it was false or with reckless disregard" of its truth or falsity. N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).

"At the heart of every action for . . . defamation is the threshold issue of whether the language used is reasonably susceptible of a defamatory meaning." Kotlikoff v. Cmty. News, 89 N.J. 62, 67 (1982). This issue "is one of law to be resolved by the court." Ibid. Confronted with the issue of whether a statement is defamatory, a court "must consider the content, verifiability, and context of the challenged statements." Ward v. Zelikovsky, 136 N.J. 516, 529 (1994).

When considering a statement's content, a court looks "to the fair and natural meaning which will be given it by reasonable persons of ordinary

intelligence."   Romaine v. Kallinger, 109 N.J. 282, 290 (1988) (citations omitted).  Name calling, "[n]o matter how obnoxious, insulting or tasteless, . . . is regarded as a part of life for which the law of defamation affords no remedy." Ward, 136 N.J. at 529-30 (quoting Rodney A. Smolla, Law of Defamation, §4.03 at 4-11 (1986)).  In the same vein, statements of rhetorical hyperbole are not defamatory.  Id. at 530.  "Courts thus distinguish 'between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse.'"  Id. at 530 (quoting Smolla, §4.03, at 4-10).

Evaluating verifiability "requires courts to determine whether the statement is one of fact or opinion."  DeAngelis, 180 N.J. at 14 (citing Ward, 136 N.J. at 530).  That exercise, in turn, requires a court to consider whether a statement is true or false.  Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167 (1999). "Factual statements, unlike non-factual statements, are uniquely capable of objective proof of truth or falsity."  Ward, 136 N.J. at 530.  "Opinion statements, in contrast, are generally not capable of proof of truth or falsity because they reflect a person's state of mind."  Id. at 531.

Opinions are generally considered non-defamatory, but "[h]arm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false."  Ibid. (citing Milkovich v. Lorain

Journal Co., 497 U.S. 1, 18 (1990)). "Unless a statement explicitly or impliedly rests on false facts that damage the reputation of another, the alleged defamatory statement will not be actionable." Ibid.

"Loose, figurative or hyperbolic language is not likely to imply specific facts, and thus is not likely to be deemed actionable." Lynch, 161 N.J. at 167-68 (citing Ward, 136 N.J. at 532). "The higher the 'fact content' of a statement, the more likely that the statement will be actionable." Id. at 168 (quoting Ward, 136 N.J. at 531-32). "If a statement could be construed as either fact or opinion, a defendant should not be held liable." Ibid.

In addition, "[w]here an opinion is accompanied by its underlying nondefamatory factual basis, . . . a defamation action premised upon that opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." Kotlikoff, 89 N.J. at 72-73.

Because "the context of a statement can affect significantly its fair and natural meaning," Lynch, 161 N.J. at 168, "courts permit the context in which the statement appears to inform its determination of whether the statement was capable of a defamatory meaning." Ward, 136 N.J. at 532. "Words uttered face

to face during an altercation may well be understood merely as abuse or insult, while words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously." Id. at 533 (quoting Restatement (Second) of Torts, §566 comment e (Am. Law Inst. 1977)).

"If a published statement is susceptible of one meaning only, and that meaning is defamatory, the statement is libelous as a matter of law." Romaine, 109 N.J. at 290. If the published statement "is susceptible of only a non-defamatory meaning, it cannot be considered libelous, justifying dismissal of the action." Ibid. If, however, "the statement is capable of being assigned more than one meaning, one of which is defamatory and another not, the question of whether its content is defamatory is one that must be resolved by the trier of fact." Id. at 290-91.

Our Supreme Court has recognized that "[c]ertain kinds of statements denote such defamatory meaning that they are considered defamatory as a matter of law." Id. at 291. "A prime example is the false attribution of criminality." Ibid. Another example is a statement that "disparage[s] the plaintiff in pursuit of his business, trade, profession, or office, or tend[s] to harm him in it." Ricciardi v. Weber, 350 N.J. Super. 453, 477 (App. Div. 2002) (citing

Restatement (Second) of Torts, §573 (1977)); accord, Ward, 136 N.J. at 526. "The words must affect the plaintiff in a way that is peculiarly harmful to one engaged in his trade." Ibid. (citing Restatement (Second) of Torts, §573).

Thus, "[t]he 'false attribution' of a quotation to a speaker may be defamatory if putting the words in the plaintiff's mouth 'cast[s] doubt on the plaintiff's fitness for his profession.'" Chau v. Lewis, 771 F.3d 118, 131 (2d Cir. 2014) (quoting Mahoney v. Adirondack Publ'g Co., 517 N.E.2d 1365, 1368 (N.Y. 1987)); see also Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 511 (1991) ("[R]egardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.").

Plaintiffs who prove defamation and the requisite degree of fault can recover three types of damages: "(1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." W.J.A. v. D.A., 210 N.J. 229, 239 (2012) (citing Prosser & Keeton on Torts, §116A at 842 (5th Ed. 1984) (footnote omitted)). Compensatory damages are "the real losses flowing from the defamatory statement." Ibid. (citing Prosser & Keeton, at 843). Compensatory damages include out-of-pocket losses,

impairment to reputation, standing in the community, personal humiliation, mental anguish, and suffering to the extent that the compensatory damages flow from the reputational injury. Ibid. Accord, Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974).

Compensatory or actual damages subsume presumed damages – "losses 'which are normal and usual and which are to be anticipated when a person's reputation is impaired.'" W.J.A., 210 N.J. at 239 (quoting Prosser & Keeton, §116A at 843). The doctrine of presumed damages permits the plaintiff who has proved liability "to obtain a damage award without proving actual harm to his reputation." Ibid. (citing Rodney A. Smolla, Law of Defamation §9:17 (2d. ed. 2008)). Presumed damages are justified in part, due to "the difficulty of proving the effects of the defamatory statement and that harm normally results from such a statement." Id. at 239-40 (citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 760 (1985)).

Our Supreme Court has expressly held that "[p]resumed damages apply in libel cases." Id. at 240 (citing Prosser & Keeton, §112 at 785-86, §116Aat 843). A plaintiff who has proved liability may thus recover nominal damages in a defamation action if the plaintiff has not proved a compensable loss. Ibid. (citing Smolla, §9:5; Prosser & Keeton, §116A at 845). "Nominal damages are

'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.'" Id. at 240-41 (quoting Charles T. McCormick, Damages 85 (1935)). A nominal damage award represents a "judicial declaration that the plaintiff's right has been violated," and "serves the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement." Id. at 241 (quoting McCormick at 85).

Recognizing that "private persons face the real risk of harm through the modern ease of defamatory publications now possible through use of the Internet," id. at 249, the Supreme Court held in W.J.A., "in private plaintiff cases that do not involve matters of public concern[,] [w]here a plaintiff does not proffer evidence of actual damage to reputation, the doctrine of presumed damages permits him to survive a motion for summary judgment and to obtain nominal damages, thus vindicating his good name." Id. at 233. If a defendant is a public official, a public or limited purpose public figure, or if the matter involves a question of public concern, a plaintiff may recover nominal damages only by proving the defendant acted with actual malice. See Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 156 (2000) (quoting N.Y. Times, 376 U.S. at 279-80) ("[A] plaintiff asserting a defamation claim cannot rely on

42

the doctrine of presumed damages absent a finding that the defendant published the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'").

C.

With these principles in mind, we address those allegations in the complaint that plaintiffs contend the second pretrial judge erroneously dismissed on summary judgment. Although plaintiffs make a general assertion the judge erred in all of the rulings, they specifically discuss only a few of the complaint's allegations. Our primary focus is thus on the paragraphs plaintiffs have specifically discussed.[8]

1.

Plaintiffs first argue the statements that "directly or indirectly identify Lane Bajardi as 'prosbus' or Kim Bajardi as 'CuriousGal'" are defamatory. They note the only evidence in the summary judgment record on this issue were Bajardi's and Kim's certifications that they did not post under those screen

---

[8] Counsel are required to "present [a] reasonably competent analysis of the law as it relate[s] to the facts of th[e] case." Sackman v. N.J. Mfrs. Ins. Co., 445 N.J. Super. 278, 298-99 (App. Div. 2016). An argument based on conclusory statements is insufficient to warrant appellate review. Nextel of N.Y. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 45 (App. Div. 2003).

A-5668-14T4

names.  Thus, defendants' posts attributing statements posted under those screen names to Bajardi and Kim were false.

According to plaintiffs, the statements so posted "all were potentially defamatory as to the identified persons, [Bajardi and Kim]," and the judge "failed to realize that when defendants claimed that plaintiffs posted under those screen names, any negative or critical comments by 'prosbus' or 'CuriousGal' were falsely attributed to the Bajardis, who had never made any such statements."  (Emphasis added).  Although plaintiffs assert this "led to a cascade of vicious attacks" on them, they cite only two negative responsive comments, both posted under screen names whose users are unknown.

Even if we were to agree with plaintiffs that all statements falsely attributed to them were potentially defamatory, the false attributions, by themselves, do not necessarily make such statements defamatory.  Absent from plaintiffs' argument under this point heading is any discussion of the content, verifiability, or context of any statement.  Moreover, citing negative comments from two anonymous contributors to a string of posts is not evidence of either damage to their reputation or "the fair and natural meaning which will be given [to the attributed statements] by reasonable persons of ordinary intelligence." Romaine, 109 N.J. at 290.  We thus reject plaintiffs' general argument that those

statements identified in the complaint, which were falsely attributed to plaintiffs, are, without more, defamatory. An argument based on conclusory statements is insufficient to warrant appellate review. <u>Nextel</u>, 361 N.J. Super. at 45.

2.

We next address plaintiffs' argument that certain statements identified in the complaint were facially defamatory because they accused plaintiffs of criminal activity or occupational misconduct. Some but not all of these statements were based on defendants' false attribution to plaintiffs of posts by prosbus and CuriousGal. Specifically, plaintiffs argue that statements identified in the complaint's paragraphs 38, 41, 44, 47, 84, 106, 118, and 121 include accusations that are defamatory as a matter of law.

Plaintiffs first challenge the dismissal of the defamation claims set forth in paragraph 38 of the complaint. In paragraph 38, plaintiffs alleged Pincus defamed Bajardi when, on November 9, 2011, she wrote on her blog:

> Another point of note is the role of the "blogs" in the complaint, citing them as evidence of the political schism in Hoboken.
>
> GA believes this points to <u>Hoboken411.com</u>, Perry Klaussen and Lane Bajardi for their handling of leaked emails and other leaked materials as part of the conspiracy. It also points to the other political blogs –

45

whose emails were requested on the Mason-Russo resolution: Hoboken Journal, Mile Square View and Grafix Avenger.

And the Resolution (email jihad) was the 'cover' to out the illegally obtained emails by Ricciardi and forwarded to others.

Plaintiffs alleged this statement was defamatory because it falsely implied Bajardi's involvement in criminal activity, namely the theft of emails from Hoboken City Hall servers, when in fact he was not involved in the crime, a conspiracy, or the handling of leaked emails.

This blog entry represented Pincus's commentary on the federal criminal complaint filed against Ricciardi, which was based on his involvement in the theft of emails from Hoboken City Hall. In the blog, Pincus speculated that Ricciardi was covering for people. She noted her disbelief of his stated motive for stealing the emails ("to determine whether his job was secure"), and speculated that "the feds" also disbelieved the stated motive. She theorized that the prosecutor would "produce all sorts of evidence to show that Ricciardi was engaged in a political operation, a conspiracy." Thereafter, she made the statement about which plaintiffs complain, expressing her belief that Bajardi and others were part of a conspiracy to distribute the stolen emails.

Pincus followed this statement with a facetious proposal to speak with

"the Feds . . . over a falafel."  She also cited paragraphs of the federal criminal complaint against Ricciardi, which allegedly supported her expressed beliefs.

The blog post accuses Bajardi of criminal behavior, which on its face is defamatory.  Moreover, while she is expressing her opinion ("GA believes"), opinions are actionable where they imply underlying objective facts that are false.  Here, however, the statements are not actionable as defamation because they include the underlying facts on which the opinion is based, namely, excerpts from the federal criminal complaint filed against Ricciardi.  Anyone who read the blog was thus capable of assessing the validity of Pincus's opinion.

In paragraph 41 of the complaint, plaintiffs alleged Pincus defamed them by falsely implying they received unreported income from Mason and were engaged in tax evasion, and she encouraged readers to contact the IRS to initiate an unwarranted investigation of them.  On December 23, 2011, Pincus wrote on her website:

> Then there's CuriousGal (Bajardi's Bridezilla) – who's NOT curious enough to know why her hubby's never appeared on a Mason ELEC or if that revenue stream has been reported to the I.R.S.
>
> GA's heard the I.R.S. has given cash rewards to those who report tax cheats.  Maybe CuriousGal can get us the answer:  How to Report Suspected Tax Fraud Activity:

A-5668-14T4

> http://wwww.irs.gov/individuals/article/0,,id=106778,
> 00.html) I hear the I.R.S. is curious about unreported
> income.
>
> > . . . .
>
> A real curious gal might want to know what happens to
> whose compensation for political campaign work goes
> unreported to the NJ Election Law Enforcement
> Commission and the I.R.S.
>
> GA is certainly curios about that.  I must be a Curious
> Gal.

Pincus made the statement in the context of a post titled "Smartboards and the I.R.S.," in which she primarily addressed the quality of education in the Hoboken public school system and criticized those who disparaged Hoboken's public schools without having visited one.  She questioned whether those disparaging the schools were doing it "[f]or compensation?" or "[f]or fun?"

Once again, Pincus implied that Bajardi may have unreported income from Mason, and plaintiffs may have engaged in tax fraud by failing to disclose such income.  However, the statements are not presented as factual assertions.  Rather, Pincus's phrasing is theoretical.  For example, she uses the phrase "if that revenue stream has been reported to the IRS" (emphasis added).  Overall, she suggested that these issues should be investigated by Kimberly, who she claimed was "CuriousGal"; the New Jersey Election Law Enforcement Commission; or the I.R.S.  Because the language about which plaintiffs

complain is not a statement of fact, it is not actionable as defamation.

Plaintiffs challenge the dismissal of the defamation claim set forth in paragraph 44 of the complaint. In paragraph 44, plaintiffs alleged that Heyer defamed them when, on January 13, 2012, he wrote on the website hobokenpatch.com, under the screen name ThisMeansWar:

> Has it occurred to Lane Bajardi that he may be looking at hefty prison time? He has NEVER appeared in an ELEC report for Beth Mason or Tim Occhipinti. He appears in this midnight video for Occhipinti's campaign leaders. . . . Is he credited in Beth Mason's IRS filings? Does he credit her in his tax forms? http://www.fbi.gov/news/ videos/inside-the-fbis-internet-tip-line.

Bajardi denied being a paid political operative of Mason or Occhipinti, and plaintiffs alleged this statement was defamatory because it implied Lane's involvement in criminal activity, and encouraged readers to report him to the FBI, thereby harming his reputation and employment prospects.

Heyer made this statement in the context of the comments section of a newspaper's website, following a newspaper article titled "City to Choose New Insurance Plan for Its Employees." Heyer's comment had no relationship with the subject matter of the newspaper article, nor was it responsive to comments made by individuals using other screen names. Rather, it appeared to be a gratuitous attack on the individual who posted under the screen name prosbus,

whose remarks Heyer falsely attributed to Bajardi.

At his deposition, Heyer admitted that he wrote this statement without having performed any investigation. He also admitted that he had no evidence to support a statement that Bajardi had done anything to warrant prison time.

Explaining why he believed Bajardi would be facing "hefty prison time," he stated that the 2010 campaign was "observably sleazy," with suggestions that people were paid to vote. Also, in his opinion, Bajardi's participation in the campaign was "an awful lot of involvement for . . . somebody who is . . . unemployed and raising a . . . small child in an affluent, expensive community to be doing for free – it doesn't pass the smell test. So, that's really what I was saying."

Heyer did not know what crime Bajardi might go to prison for. He suggested that Bajardi was being "paid off the books," in violation of election and tax laws. However, he admitted he had no evidence that Lane had been paid for his efforts on behalf of Mason or Occhipinti.

We agree with the trial court's conclusion that the language plaintiffs challenge poses rhetorical questions rather than statements of fact, and thus is not actionable as defamation. We also note that "[t]he pace and structure of the contemporary American scene are such that today, public debate is seldom found

in village squares and town meetings." <u>Kotlikoff</u>, 89 N.J. at 73. It is more likely found on the internet and is often crude, contentious, and opinion rather than fact based.[9] Reasonable people of ordinary intelligence, giving such statements as those posted by Heyer their fair and natural meaning, would understand they were opinion based and would be unlikely to believe they were factual, especially considering the venue in which they were made.

We disagree with the second pretrial judge's summary judgment dismissal of the allegations in paragraph 47. In that paragraph, plaintiffs claim Pincus defamed Bajardi on January 18, 2012, when she sent the following email to his employer:

> Lane Bajardi is a hyper-partisan political operative who blogs under the screen name 'prosbus', and is now

---

[9] Public commentary and debate often take place on the internet on websites dedicated to such debate, and in the comments sections that often follow news articles. Online comments sections do not always contain civil, intellectual discourse. Rather, they are at times characterized by coarseness and incivility. <u>See, e.g.</u>, Barbara Ortutay, <u>Websites Try to Clean Up Cesspool of Online Comments</u>, Washington Post, Dec. 27, 2013 (available at https://www.washingtonpost.com/business/economy/web-sites-try-to-clean-up-cesspool-of-online-comments/2013/12/27/520f11a4-6e6d-11e3-a523-fe73f0ff6b8d_ story.html?utm_term=.7ec2bf4097d6 (last visited July 22, 2019); Daniel J. Schneider, <u>Our article comments have been a cesspool of trolls and spam for years. Enter Civil Comments</u>, Denver Post, May 22, 2017 (available at https://www.denverpost.com/2017/05/22/denver-post-civil-comments/)(last visited July 22, 2019).

fomenting anti-Semitism in his latest effort to smear Hoboken's Jewish mayor, Dawn Zimmer.

As a Jew, I am offended and disgusted by this. As a well-known political blogger in Hoboken, I will be asking my community to reject Mr. Bajardi and his hate-mongering. I don't think your advertisers will appreciate a voice on your airwaves actively engaged in spreading bigotry and intolerance in the Hoboken community.

Please read this thread to see Mr. Bajardi's comments in situ: http://hoboken.patch.com /articles/st-patrick-s-day-parade-canceled. See how he (fallaciously) raises the notion that the mayor's administration is 'anti-Christian' and religiously intolerant. Disgusting.

Here are (2) of Mr. Bajardi's posts attached, in case he has them deleted first:

--------------------------------------------
**prosbus**
10:42 am on Monday, January 16, 2012
Santa was removed from Calabro; Zimmer got angry with Father Vinny after the police mass at St. Ann's Roman Catholic Church last year; Saint Patrick's Day Parade cancelled  . . . some are seeing a pattern developing.
--------------------------------------------

**prosbus**
1:04 pm on Monday, January 16, 2012
The definition of anti-semitism is suspicion of, hatred toward, or discrimination against Jews for reasons connected to their Jewish heritage. Nothing could be further from the truth. What I do know as facts are these:

A-5668-14T4

1) Santa was removed from the public schools this Christmas– specifically in Calabro because it was a "religious" symbol even through [sic] the Supreme Court has ruled he is a cultural symbol.  This removal was done by the Zimmer supported Kids First majority Board of Education.

2) Last year, in a well known incident, Mayor Zimmer raised her voice repeatedly and had to be restrained after the police mass at St. Ann's Roman Catholic Church because she felt Fr. Vinny made some illusions to recent policy decisions by the mayor (Fr. Vinny is a very class act and did not comment on the incident although it was witnessed by dozens of people).

3) The St. Patrick's Parade committee recently cited Mayor Zimmer's "religious/cultural intolerance" in a lettering surrounding the events of the recent St. Patrick's Parade cancellation.  St. Patrick is the most generally recognized patron saint of Ireland and a strong symbol of the Irish American heritage of the City of Hoboken.

A climate of intolerance is building up in this city and it is centered around religious and cultural issues.  The former whispered voices are now becoming a chorus.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I am extremely angry that Mr. Bajardi has taken this divisive and hateful tone.  Of all days, on MLK's birthday.

Feel free to contact me.

Nancy Pincus
[Phone Number]

http://grafixavenger.blogspost.com/

In paragraph 49 of the complaint, plaintiffs alleged: "The statements are false and defamatory because Mr. Bajardi – who is Jewish – is not anti-Semitic, nor has he posted anything anti-Semitic, or anything attacking other ethnic or religious groups. Further, Mr. Bajardi is not a political operative, and does not post to the internet under the pseudonym prosbus." In paragraph 50 of the complaint, plaintiffs alleged the defamatory email harmed his relationship with his employer by encouraging the employer to terminate his employment "through its threat to harm 1010WINS radio's listenership." Plaintiffs did not allege any negative employment action was taken against Bajardi, but in discovery claimed the allegation limited his ability to negotiate a higher salary. Plaintiffs contend this post as well as other statements "impute occupational misconduct and, thus, constitute defamation per se."

In her response, Pincus does not specifically address the allegations in paragraph 47. Rather, she asserts that when an action implicates a public interest, a plaintiff's failure to allege any reputational or pecuniary harm precludes a defamation claim. She relies on Rocci, 165 N.J. 149, to support that proposition. She also relies on the explanation provided by the second pretrial judge. Unlike most of the other allegedly defamatory statements identified in the complaint, Pincus's email to Bajardi's employer did not involve a post to the

internet in the context of a discussion about ongoing political factionalism. Thus, it was not made in the context of a discussion on a website in which Bajardi's employer may have had no interest.

We agree with the second pretrial judge that Pincus's allegation of anti-Semitism was inactionable, because it was an expression of opinion and because the facts upon which it was based were included in the email. We also agree that Pincus's characterization of Bajardi as a hyper-partisan political operative is inactionable hyperbolic name-calling. Those determinations, however, do not address the question of whether the false attribution of the statements to Bajardi, and the allegation he was engaging in such controversial discourse, ascribed to Bajardi conduct that would adversely affect his fitness for his business. The false attribution ascribed such conduct to Bajardi. Because the false attribution, and thus the false accusation, put words in Bajardi's mouth that cast doubt on his fitness for his occupation, the statements were defamatory and actionable.

Pincus contends that defamation per se is no longer actionable in the matter of a public official, public figure, or question of public concern. The argument misses the point. Statements that falsely ascribe to a public figure conduct that affects the public figure's fitness for the proper performance of his or her business are actionable if made with actual malice. Here, the second

A-5668-14T4

pretrial judge overlooked that Pincus's email to Bajardi's employer falsely ascribed to Bajardi conduct that was not only inconsistent with the performance of his work, but conduct that, if true, would have resulted in the termination of his employment. The issue the motion judge did not reach is whether the statements were made with actual malice.

The motion judge made no determination about whether Bajardi was a limited purpose public figure on this issue, or whether it involved a question of public concern, because she decided the allegedly defamatory statement was not facially defamatory. Given the nature of Bajardi's status as a limited public figure, one could question whether such status or Hoboken political factionalism was relevant to his employment outside of Hoboken. Perhaps he was a public figure for another reason – the nature of his job. The judge who decided the September motions never addressed these issues.

Pincus claimed she assumed prosbus and CuriousGal were the Bajardis, apparently based on tone and content of the posts under those screen names. We question whether that bare assertion presents a factual issue for the jury. In any event, there is significant evidence to the contrary. Pincus's own posts stated expressly that her posts were not personal or intentionally cruel, except with respect to two people, one of whom was Bajardi. Her posts confirm her

awareness that Bajardi had stopped posting and stopped attending council meetings. There is also evidence on the motion record suggesting Pincus knew that if Bajardi was posting, overtly or clandestinely through screen names, about Hoboken politics or questions of public concern, he would be disciplined or fired.

Regardless, as we have noted, the judge who decided the September motions did not address the question of actual malice on this issue. Because the issue was decided on summary judgment, neither plaintiffs nor Pincus had the opportunity to present the issue at trial. Although we remand on this issue, we do not preclude the parties from either fully developing a motion record on the issue or visiting it at the close of plaintiffs' evidence at trial. We reverse the grant of summary judgment with respect to the defamation allegation set forth in paragraph 47 of the complaint and remand for further proceedings.

Plaintiffs next complain about dismissal of their defamation allegations set forth in paragraph 84 of the complaint. In this paragraph, plaintiffs alleged Pincus defamed them in the following February 3, 2012 comment she made on the website galloway.patch.com:

> I live in Hoboken. We have a sickness living amongst us- his name is Lane Bajardi and his wife is Kim Cardinal. Here they are posting as: VinVan, CuriousGal, prosbus, OutofControl. Both of them work

in the media – Bajardi is an anchor with 1010WINS radio. They are very sick people – Bajardi was actually arrested for assaulting a local blogger and stealing his camera. . . . These [two] run smear campaigns on anyone affiliated with Mayor Dawn Zimmer. And they are sick people. Undiagnosed, with serious personality disorders. I was no surprised to find out that they were smearing [an employee], and [sic] EXCEPTIONAL Business Administrator. Do your best to ignore these [two] – we call them Mr. and Mrs. Melanoma. I'm a blogger and political activist, and also a frequent target of these [two] malevolent creatures. Do contact me with questions: grafixavenger666@gmail.com http://grafixavenger.blogspot.com/.

Plaintiffs claimed the comment was defamatory because it referred to them as "a sickness," which was highly damaging to their reputations, particularly because Pincus identified Bajardi's place of employment and thereby endangered his job. Plaintiffs again denied posting under the pseudonyms CuriousGal, VinVan, prosbus, and OutofControl.

Pincus made the statement in the context of the comments section to a news article published on galloway.patch.com about the appointment of a former Hoboken business administrator to a new position. The comments section consisted mostly of people expressing opinions about the former Hoboken business administrator, and Hoboken politics in general.

Although, as previously noted, falsely attributing a statement to a person may constitute defamation in some circumstances, here Pincus merely expressed

A-5668-14T4

a negative opinion.  No matter how distasteful, the name-calling is not actionable as defamation.

Plaintiffs next complain about dismissal of their defamation allegation set forth in paragraph 106 of the complaint.  In this paragraph, plaintiffs alleged Heyer, posting under the screen name JackStop, defamed them in the following comment he posted on nj.com on May 29, 2012:

> http://3.bp.blogspot.com/-HJ2tPQHSFoE/T2NdUn8S77I/AAAAAAAACBI/KquYD6CgRc/s1600/cammarano+bajardi.jpg.    Future convicted felons Lane Bajardi & Kim Cardinal sucking up to soon-to-be convicted felon Peter Cammarano like a pair of remoras.

In paragraph 108 of the complaint, plaintiffs noted that Heyer's post displayed a picture of what appeared to be Lane with Cammarano, and in paragraph 109, plaintiffs alleged the statement was defamatory because it falsely implied that plaintiffs were involved in criminal activity through their association with Cammarano.

Heyer's name-calling ("remoras") is not actionable as defamation.  On the other hand, his referring to plaintiffs as "future convicted felons" could be considered defamatory if, when viewed in context, the reader would be left with the impression that plaintiffs were being accused of criminal acts on the basis of undisclosed factual allegations.  However, judged by how a reasonable person

would view the comments, particularly considering their context and content, and the apparent attribution of criminality based merely upon an association with Cammarano, we conclude the statements were not defamatory. Plaintiffs' alleged association with Cammarano is not actionable as defamation.

Plaintiffs next complain about dismissal of their defamation allegation set forth in paragraph 121 of the complaint. In this paragraph they alleged that Pincus defamed Kimberly in the following June 23, 2012 statement made on her blog:

> CONSPIRATOR B: The political operative who posts online under many different monikers, but mostly as CuriousGal and prosbus, and has never denied she is Kim Cardinal. Cardinal is the current (or former) wife of 1010WINS cabby-crooner Lane Bajardi. Cardinal has not denied she's moved out of Hoboken to a waterside development in Edgewater. Curious Kim has been the Energizer Bunny of this conspiracy to seed Patch with closed-session allegations- which cannot be debated or refuted because they are closed session. This is Cardinal's modus operandi-planting ugly rumors online, lies and spin, against those she perceives as 'enemies'. All disturbing, and in his case, her victim is an African American. The vigor and venom with which CuriousGal has pursued this individual with unethically-obtained information NOT AVAILABLE BY OPRA REQUEST suggests a very dark motive driving her animus toward this African American professional.

In paragraph 123, plaintiffs claimed these statements were defamatory

A-5668-14T4

because they falsely implied Kimberly's involvement in criminal activity through improper access of information, and they falsely implied Kimberly was a racist or posted racist comments, and falsely implied the Bajardis were divorced. Kimberly made similar denials in opposition to summary judgment.

Pincus made the statements in the context of a blog post titled "Data Smuggling at the BoE: Whodunit?" In the post, Pincus alleged that Kimberly disclosed information obtained from a closed session board of education meeting, which she obtained from an unnamed co-conspirator identified as "CONSPIRATOR A." In the blog post, Pincus identified people she had ruled out as Conspirator A, and wondered who Conspirator A could be.

We affirm the dismissal of this claim, substantially for the reasons expressed by the motion judge. We add only our conclusion that a reader of ordinary intelligence would not likely view the comments as implying criminal activity.

In denying summary judgment in part, the second pretrial judge determined that as to the surviving claims, the applicable standard of fault was actual malice, because Bajardi was a limited purpose public figure with respect to the issue of contentious factionalism present in Hoboken politics. Moreover, even though Bajardi claimed to have withdrawn from civic involvement, he

remained a public figure for purpose of later commentary or treatment of the issue. Alternatively, the actual malice standard applied because the subject matter of the alleged defamatory statements was Hoboken politics, which was an issue of public concern.

As to the remaining claims, the motion judge determined the issue of actual malice presented a jury question. The judge explained:

> Plaintiff submitted evidence establishing that Defendant Pincus made no effort to investigate 1) whether Plaintiff was a person of interest to the FBI; 2) whether Plaintiff handled leaked emails or other materials from Hoboken City Hall or whether he was part of a conspiracy; 3) whether he was questioned by the FBI; 4) whether Plaintiff was part of a criminal conspiracy to steal the mayor of Hoboken's email. This evidence is sufficient to create a triable issue as to whether the remaining statements were made with actual malice at this juncture in the sense of having knowledge that they were false or acted in reckless disregard of the truth or falsity.

Plaintiffs challenge the judge's determination on the grounds that: (1) the issue of Hoboken's political factionalism was insufficiently specific to qualify as a matter of public concern, and each statement should be assessed individually to determine whether it addressed a matter of public concern; and (2) Bajardi was not involved in the subject matters addressed in defendants' allegedly defamatory statements, but rather was "dragged" into the issues via

defendants' false attributions to him of statements made by others.

With the exception of the allegations in paragraph 47 of the complaint, which we have previously addressed, and except for the following brief comments, we find plaintiffs' arguments without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

People who have "thrust themselves 'into the vortex of [a] public issue,' or who ha[ve] 'engage[d] the public's attention in an attempt to influence its outcome,'" are limited public figures. Barasch v. Soho Weekly News, Inc., 208 N.J. Super. 163, 170 (App. Div. 1986) (quoting Gertz v. Welch, 418 U.S. 323, 352 (1974)). Moreover, "once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy." Berkery v. Kinney, 397 N.J. Super. 222, 228 (App. Div. 2007) (quoting Street v. National Broadcasting Co., 645 F.2d 1227, 1235 (6th Cir. 1981)).

Through his confrontational style, by the tone and manner of his discourse at city council and board of education meetings, and through his internet commentary, Bajardi quite clearly thrust himself into the vortex of Hoboken political factionalism – including the disparate views of the incumbent mayor and those with whom she was aligned on one side, and her challengers and those

with whom they were aligned on the other. Indisputably, he engaged the public's attention in an attempt to influence the public's views on political candidates, political appointees, and the outcome of elections. Considering the scope of issues subsumed within the broader views of political candidates, public officeholders, including school board members, and office seekers, Bajardi's argument that the motion judge should have somehow parsed, compartmentalized, and segregated the issues on which defendants criticized him after he withdrew from the political scene, is devoid of merit.

Moreover, Bajardi does not specifically discuss any of the allegedly defamatory comments and explain why they are not encompassed within the views he previously advocated publicly or why they do not involve a matter of public concern. See n.6, ante. Accordingly, except as discussed above, we affirm the second pretrial judge's grant of summary judgment.

III.

We next address plaintiffs' arguments that the trial judge erred by granting defendants' motion for judgment at trial. They first argue the trial judge erred by accepting the second pretrial judge's decision on the September motions that Bajardi was a limited purpose public figure and that the allegedly defamatory statements involved matters of public concern. We reject these arguments for

the reasons we explained in part II of this opinion.[10]

Alternatively, plaintiffs argue that their evidence was sufficient to raise a jury question as to whether defendants made the defamatory statements with actual malice. With the exception of the allegations in paragraph 87, we reject plaintiffs' arguments and affirm the dismissal, substantially for the reasons expressed by the trial judge. We disagree that the defamation claim based on paragraph 87 of the complaint should have been dismissed, and therefore we address that claim.

In granting defendants' motions for judgment under Rule 4:40-1 at the close of Bajardi's case, the trial judge determined Bajardi had not presented evidence that defendants' statements were wholly false, since the evidence showed that Bajardi had actively engaged in Hoboken politics, and stolen emails were ultimately found on his email account. Thus, defendants had a reasonable basis for believing the truth of their statements. The judge also noted Bajardi's failure to prove any damages through reputational injury or a negative impact on his employment or otherwise, and held that he was not entitled to presumed

---

[10] Plaintiffs also argue the trial judge erred by precluding them from calling a witness who purportedly would have testified he was the person who posted under the screen names of prosbus and CuriousGal. Although we leave that issue to the retrial judge's discretion, it is difficult to discern why such testimony would not be relevant if defendants have a bona fide dispute to the contrary.

damages "absent clear and convincing evidence of actual malice."

Summarizing his ruling, the judge stated:

> In light of the foregoing reasons, it is evident that reasonable minds could not differ that plaintiffs' evidence, even with all reasonable inferences and without consideration to the weight, worth, nature or extent of the evidence, is simply insufficient to support a finding of actual malice or reputational injury. And, therefore, the plaintiffs' complaint is dismissed.

Rule 4:40-1 authorizes a party to make a motion for judgment at the close of the evidence offered by an opponent. Motions for judgment should be denied if the evidence and all legitimate inferences that may be deduced from it could sustain a judgment in favor of the opposing party. Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008); Zive v. Stanley Roberts, Inc., 182 N.J. 436, 441-42 (2005); Verdicchio v. Ricca, 179 N.J. 1, 30 (2004); Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). When reviewing a trial court's order granting a motion for judgment at the close of an opponent's evidence, we apply the same standard as the trial court. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016); ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). We owe no deference to the trial court's rulings on issues of law. Manalapan Realty, L.P. v. Twp. Comm. at Manalapan, 140 N.J. 366, 378 (1995).

Paragraph 87 of the complaint identified the following post, which Pincus

posted on February 3, 2012, in the comments section of an article posted on galloway.patch.com:

> Bruce, the "39-year civil servant" is Al Arezzo, a former Construction Code official who 'allegedly' extorted people I know and is infamous in our city. Curious Gal (Kim Cardinal) is a hideous political operative whose husband has worked for years on the campaigns of a wealthy local Councilwoman named Beth Mason, yet Bajardi has NeveR appeared on a Mason an ELEC report-meaning perhaps lots of undeclared income to the IRS. Oops!
>
> . . . Mr. Bajardi, blogging here as VinVan has been questioned by the FBI, and is believed to be part of the criminal conspiracy to steal our mayor's e-mail and traffic[k]ing in confidential city information. A friend of Bajardi's named Patrick Ricciardi, has been arrested. More arrests will follow. Don't be surprised if you read about him in the paper. . . .

This statement is defamatory because it falsely states Bajardi has been questioned by the FBI and alleges, although couched in terms of "it is believed," that Bajardi is involved in specific criminal acts.

At trial, Bajardi and Ricciardi testified that Bajardi was not involved in Ricciardi's theft of the mayor's emails, and Bajardi testified that he was never questioned by the FBI about any matter. Pincus admitted that she had not performed any research to support the truthfulness of her accusation. She also admitted that when she wrote the comment she had no knowledge of Bajardi

A-5668-14T4

having been questioned by the FBI, or of his having been involved in the theft of emails. From that testimony, the jury could have concluded Pincus simply fabricated the accusations.

In addition, in dismissing Bajardi's claim based on paragraph 87, the trial judge based his decision in part on his belief that "evidence of stolen e-mails subject of the FBI investigation . . . were present on Mr. Bajardi's e-mail account." The judge's belief was not supported by the record and the conclusion he drew from it was contrary to the standard of review.

During the trial, defendants attempted to prove this allegation based on emails found on Bajardi's email account during discovery – substantially after Pincus had written her allegedly defamatory statement. She could not have relied on them when she made the false allegations. Moreover, Ricciardi testified that the emails on Bajardi's account were not ones he had stolen, and Bajardi denied any awareness of the emails until they were produced in discovery. Thus, the standard of review under Rule 4:40-1 required the judge to accept the testimony of both Bajardi and Ricciardi. Had he done so, he would not have made his mistaken assumption.

This evidentiary record was sufficient to prove actual malice. Pincus's claim that Bajardi had been questioned by the FBI, and her assertion

A-5668-14T4

immediately following that false statement, in the same sentence, that it was believed he was part of a conspiracy to steal the mayor's emails, had no basis in fact. The jury could have concluded the statements were "fabricated by the defendant, . . . the product of [her] imagination, or . . . based wholly on an unverified anonymous [source]." Durando v. Nutley Sun, 209 N.J. 235, 252 (2012). These facts would satisfy the actual malice standard even in the face of an allegation of good faith. Ibid. Thus, the trial judge should have denied defendants' motion on this claim.

Plaintiffs also claim the judge erroneously determined that Bajardi's claim failed because he had failed to prove actual damages. We do not interpret the judge's explanation as so holding. Rather, the judge appeared to have made his observation about damages in the context of his determination that Bajardi had not proved actual malice. On retrial, if the jurors conclude Pincus made the defamatory statements with actual malice, Bajardi can recover nominal damages in the absence of proof of actual damages. W.J.A., 210 N.J. at 240-41; Restatement (Second) of Torts § 620, cmt. c.

IV.

Last, we address plaintiffs' and their attorneys' challenges to the imposition of frivolous claim fees and sanctions. Plaintiffs argue that sanctions

69

were unwarranted because they had a good faith basis to pursue their claims, their claims were legally complex, they relied upon counsel to evaluate the merits of their claims, and several of their claims survived multiple summary judgment motions and motions to dismiss, with numerous judges deeming the claims sufficient to proceed to trial. Plaintiffs further contend that as a matter of procedure, defense counsel's letters under N.J.S.A. 2A:15-59.1 were insufficient because they did not set forth the legal basis upon which the suit was ultimately dismissed.

Plaintiffs' respective counsel, Gibson and Cohen, insist they reasonably believed the complaint had merit. Like plaintiffs, they emphasize the claims survived multiple dispositive motions. They, too, contend the trial judge erred by concluding as part of the basis for his decision that plaintiffs were required to prove actual damages. Cohen adds that as a matter of procedure, Heyer's motion for sanctions should have been denied because he, Cohen, never received Heyer's counsel's "safe harbor" letter.

Defendants respond that plaintiffs' complaint was filed not in good faith, but rather to harass defendants and chill their First Amendment right to free speech. They discount the denial, in whole or in part, by the two pretrial judges of their multiple motions to dismiss the complaint for failure to state a cause of

action and for summary judgment. Defendants accuse plaintiffs of filing the complaint and pursuing it in the absence of any evidence of either malice on defendants' part or damage to their reputations. Defendants also dispute plaintiffs relied on the advice of their attorneys in pursuing the defamation action, claiming instead that plaintiffs pursued the action for political motives.

Defendants also argue that plaintiffs' attorneys knew the action had no merit, because no proof existed of either malice on the part of defendants or reputational damage to plaintiffs. Defendants accuse the attorneys of, among other improprieties, making misrepresentations to the court.

In short, defendants argue the trial judge's award of fees and imposition of sanctions are amply supported by the record and a proper exercise of discretion.

Following the dismissal of the case at trial, the trial judge granted defendants' motions for counsel fees and sanctions. The court ordered Gibson to pay sanctions to the court in the amount of $1000 for violating <u>Rule</u> 1:4-8(a)(1), (2), and (3), and Cohen to pay sanctions to the court in the amount of $2000, for violating <u>Rule</u> 1:4-8(a)(1), (2), and (3). The court also ordered plaintiffs to pay the following: $26,033 to Pincus; $22,687 to Brice; $225,757 to Heyer; and $2200 to Heyer and the ten screen name defendants.

In his written opinion, the judge first concluded that the Rule 1:4-8 letters sent by defense counsel were sufficient to satisfy the procedural requirements of Rule 1:4-8 and N.J.S.A. 2A:15-59.1. The judge also found that counsel's certifications complied with R.P.C. 1.5(a).

Addressing the substantive requirements for fees and sanctions, and concluding that plaintiffs' complaint was frivolous, the trial judge noted plaintiffs' complaint was pled in a "shotgun approach," the majority of plaintiffs' claims were dismissed on summary judgment, and the few claims that survived ultimately were not supported by proof of actual malice or actual damages. The judge assailed plaintiffs' motives in pursing the litigation, stating:

> The Bajardis did not simply rely on their attorney's review of the documentation and interpretation of the law when pursuing their claim to collect on a judgment. Rather, this Court finds that Plaintiffs were limited public figures who manipulated their attorney to perpetrate and perpetuate a SLAPP-suit disguised as a defamation case involving weighty issues of constitutionally protected First Amendment political free speech.

Ultimately, the judge concluded that defendants were entitled to an award of counsel fees under N.J.S.A. 2A:15-59.1, due to plaintiffs' pursuit of frivolous litigation. He particularly noted plaintiffs' failure to prove economic damages, stating:

72

In this case, the heart of Plaintiffs' claims were economic and reputational damage. Plaintiffs' [sic] here did not simply rely on advice of counsel when bringing their claims. This is not a case where the attorney evaluated a basis for a claim in the law. Rather, it is a situation where the clients represented to the attorney that they suffered reputational and pecuniary damage – something that is particularly within their own purview to assess. Plaintiffs represented to their counsel that damages existed as a result of the alleged defamatory conduct. No proof of damages was ever presented. . . .

The judge also determined plaintiffs were not "forthcoming" with their counsel "as to the extent of their political involvement both on the internet and in person." According to the judge, "[p]laintiffs acted in bad faith and continually pursued claims with no basis in fact, while misrepresenting the facts to their counsel and to the Court. Plaintiffs' conduct throughout this case at a minimum demonstrates bad faith, and approaches a fraud upon the Court." Thus, the judge found that "the Bajardis' claims were frivolous, were pursued in bad faith, and with the purpose of harassment, delay, and malicious injury, in violation of N.J.S.A. 2A:15-59.1."

Regarding Gibson, the judge concluded that he "failed to conduct a reasonable inquiry under the circumstances, and failed to withdraw or correct Plaintiffs' claims when a reasonable inquiry would have required [him] to do so," and therefore he "prosecuted claims which [he] knew or should have known

had no factual or legal basis." The judge noted facts about which Gibson should have been aware, particularly, plaintiffs' inability to establish any economic or pecuniary harm resulting from the alleged defamation, and Bajardi's insertion of himself into public discourse. Accordingly, the judge concluded that Gibson asserted frivolous claims on behalf of plaintiffs in violation of Rule 1:4-8(a)(1), (2), and (3), warranting sanctions.

Regarding Cohen, the judge concluded that he "failed to conduct a reasonable investigation under the circumstances." The judge noted plaintiffs' inability to prove any economic harm or pecuniary injury, verification of which would have required "minimal effort by Cohen, and could have been accomplished by a single discussion with his clients and a cursory review of their financial records."

The judge added:

> Not until the court heard oral argument on these motions for sanctions and attorney's fees did Cohen, for the first time, argue that he intended only to pursue the defamation per se claims. This was a belated attempt to explain why he possessed no facts regarding pecuniary or reputational damages, and why none were ever presented. This was also contrary to the prior representations and conduct of Cohen up until this point in time. Cohen and Gibson both argued to the Court that actual damage existed and would be proven. In cases where only defamation per se is pursued,

> attorneys generally indicate as much to the Court and
> the other parties. . . .

This statement was incorrect. Cohen advised the court at trial that Bajardi was attempting to prove defamation per se, and was seeking only presumed, nominal damages, as opposed to actual, pecuniary damages.

The judge nonetheless faulted Cohen for failing to withdraw the complaint and concede before trial that he had no evidence to prove actual malice. The judge thus concluded that Cohen asserted frivolous claims on behalf of plaintiffs in violation of Rule 1:4-8(a)(1), (2), and (3), warranting sanctions.

We review an award of sanctions and counsel fees for an abuse of discretion. Occhifinto v. Olivo Constr. Co., 221 N.J. 443, 453 (2015); Ferolito v. Park Hill Ass'n, 408 N.J. Super. 401, 407 (App. Div. 2009); United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 390 (App. Div. 2009). "Reversal is warranted when 'the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" Ferolito, 408 N.J. Super. at 407 (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)). We review a trial court's legal conclusions de novo. Occhifinto, 221 N.J. at 453.

New Jersey follows the American Rule, which prohibits the recovery of

counsel fees by a prevailing party against the losing party. Id. at 449; In re Estate of Vayda, 184 N.J. 115, 120 (2005); In re Niles Tr., 176 N.J. 282, 294 (2003). The purposes behind the American Rule include providing unrestricted access to the courts by all persons, ensuring equity and not penalizing a party for exercising his or her right to litigate a dispute, and administrative convenience. Occhifinto, 221 N.J. at 450; In re Estate of Vayda, 184 N.J. at 120; In re Niles Tr., 176 N.J. at 294. Thus, as a general matter, our courts "disfavor[] the shifting of attorneys' fees." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009); In re Niles Trust, 176 N.J. at 293-94. Prevailing parties may recover fees only if expressly permitted under statute, court rule, or contract. Litton, 200 N.J. at 385. See also R. 4:42-9(a).

Here, the relevant statute and Court Rule are N.J.S.A. 2A:15-59.1 and Rule 1:4-8, which permit a trial court to award sanctions and counsel fees for the pursuit of frivolous lawsuits. Specifically, N.J.S.A. 2A:15-59.1 provides, in pertinent part:

> a. (1) A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.

. . . .

b. In order to find that a complaint . . . of the nonprevailing party was frivolous, the judge shall find on the basis of the pleadings, discovery, or the evidence presented that either:

(1) The complaint . . . was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or

(2) The nonprevailing party knew, or should have known, that the complaint . . . was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

Rule 1:4-8 allows for sanctions against attorneys who submit pleadings that are presented for an improper purpose, such as harassment of the opposing party, or are not supported by evidence, or by existing law, a non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law.

A motion for sanctions under Rule 1:4-8, and for counsel fees and costs under N.J.S.A. 2A:15-59.1, must follow the procedures set forth at Rule 1:4-8(b), as follows:

An application for sanctions under this rule shall be by motion made separately from other applications and shall describe the specific conduct alleged to have violated this rule. No such motion shall be filed unless it includes a certification that the applicant served

written notice and demand pursuant to R. 1:5-2 to the attorney or pro se party who signed or filed the paper objected to. The certification shall have annexed a copy of that notice and demand, which shall (i) state that the paper is believed to violate the provisions of this rule, (ii) set forth the basis for that belief with specificity, (iii) include a demand that the paper be withdrawn, and (iv) give notice, except as otherwise provided herein, that an application for sanctions will be made within a reasonable time thereafter if the offending paper is not withdrawn within 28 days of service of the written demand. . . . The certification shall also certify that the paper objected to has not been withdrawn or corrected within the appropriate time period provided herein following service of the written notice and demand.

No motion shall be filed if the paper objected to has been withdrawn or corrected within 28 days of service of the notice and demand or within such other time period as provided herein.

See State v. Franklin Sav. Account No. 2067, 389 N.J. Super. 272, 281 (App. Div. 2006).

N.J.S.A. 2A:15-59.1 serves the dual purposes of deterring frivolous litigation and reimbursing victimized parties. Toll Bros. v. Twp. of W. Windsor, 190 N.J. 61, 67 (2007). Nevertheless, courts should exercise restraint in awarding frivolous litigation sanctions. McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 499 (App. Div. 2011) ("Sanctions are not to be issued lightly[.]"). The goal of the statute is to "deter baseless litigation," but "without discouraging

78

honest, creative advocacy," and "keep[ing] in mind our significant policy that litigants should usually bear their own litigation costs." DeBrango v. Summit Bancorp, 328 N.J. Super. 219, 226-27 (App. Div. 2000). Accord Iannone v. McHale, 245 N.J. Super. 17, 26-28 (App. Div. 1990).

In this vein, "[t]he nature of conduct warranting sanction under Rule 1:4-8 has been strictly construed," First Atlantic Federal Credit Union v. Perez, 391 N.J. Super. 419, 432 (App. Div. 2007), and the term "frivolous" has been given a restrictive meaning, McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561 (1993). "Sanctions for frivolous litigation are not imposed because a party is wrong about the law and loses his or her case." Tagayun v. AmeriChoice of N.J., Inc., 446 N.J. Super. 570, 580 (App. Div. 2016). Rather, "[a] claim will be deemed frivolous or groundless [only] when no rational argument can be advanced in its support, when it is not supported by any credible evidence, when a reasonable person could not have expected its success, or when it is completely untenable." Belfer v. Merling, 322 N.J. Super. 124, 144 (App. Div. 1999).

Moreover, clients are entitled to rely upon their attorneys for an analysis of the merits of their case. "[A] client who relies in good faith on the advice of counsel cannot be found to have known that his or her claim or defense was

baseless." <u>McKeown-Brand</u>, 132 N.J. at 558. "Although the advice of counsel will not necessarily provide a defense to a bad-faith litigant, in many cases, it may constitute an adequate explanation for the assertion of a claim or defense." <u>Id.</u> at 559.

In addition, "[f]alse allegations of fact will not justify a fee award unless they are made in bad faith, for the purpose of harassment, delay, or malicious injury." <u>Belfer</u>, 322 N.J. Super. at 144. "When the plaintiff's conduct bespeaks an honest attempt to press a perceived, though ill-founded and perhaps misguided, claim, he or she should not be found to have acted in bad faith." <u>Id.</u> at 144-45. <u>See also</u> <u>DeBrango</u>, 328 N.J. Super. at 227 (holding that counsel fee sanction not warranted where plaintiff had reasonable good faith belief in merits of claim); <u>Ellison v. Evergreen Cemetery</u>, 266 N.J. Super. 74, 86 (App. Div. 1993) ("The most that can be said is that plaintiffs were perhaps overly optimistic in seeking a remedy, but this does not mean that the litigation was essentially frivolous.").

Significantly,

> a pleading will not be considered frivolous for purposes of imposing sanctions under <u>Rule</u> 1:4-8 unless the pleading as a whole is frivolous. Sanctions are not warranted if an attorney has a reasonable and good faith belief in the claims being asserted. In our judgment, a pleading cannot be deemed frivolous as a whole nor can

an attorney be deemed to have litigated a matter in bad faith where, as in this case, the trial court denies summary judgment on at least one count in the complaint and allows the matter to proceed to trial.

[United Hearts, 407 N.J. Super. at 394.]

Accord In re Estate of Ehrlich, 427 N.J. Super. 64, 77 (App. Div. 2012), certif. denied, 213 N.J. 46 (2013). Conversely, "a grant of a motion for summary judgment in favor of a defendant, without more, does not support a finding that the plaintiff filed or pursued the claim in bad faith." Ferolito, 408 N.J. Super. at 408.

Contrary to the trial court's assessment of the complaint and plaintiffs' claims, they were not such that no rational argument could be advanced in their support and they were not completely untenable. Belfer, 322 N.J. Super. at 144. The legal issues raised by the complaint were complicated, and reasonable minds could differ as to the merit of plaintiffs' defamation claims, as evidenced by decisions of three judges who considered them on multiple pretrial dispositive motions. Several of plaintiffs' defamation claims survived the numerous dispositive motions, notwithstanding precedent that encourages early dismissal of frivolous defamation cases. Durando, 209 N.J. at 254.

Significantly, with the exception of two claims dismissed as time-barred, defendants made every allegedly defamatory statement identified in the

complaint after Bajardi had ceased his participation in Hoboken politics and civic affairs and had stopped posting on such subjects. Every allegedly defamatory statement defendants based on postings by prosbus and CuriousGal were falsely attributed to plaintiffs. Each defendant made at least one statement about plaintiffs that fell within the category of defamation per se. And plaintiffs' claims that defendants acted with malice as to those claims alleging Bajardi was involved in criminal wrongdoing, and as to Pincus's email to his employer, were not completely untenable.

The trial judge erred as a matter of law when he concluded that the defamation claims were frivolous because Bajardi could not prove pecuniary damages. As previously discussed, had Bajardi proved actual malice, he was entitled to seek nominal damages. W.J.A., 210 N.J. at 240-41; Restatement (Second) of Torts § 620, cmt. c.

The trial judge also misunderstood the record, believing Bajardi only indicated after trial, at the time of the sanctions motion, that he had been seeking only nominal damages. In contrast, the record reflects that plaintiffs' counsel made that representation to the court at trial.

The court also erred by awarding $2200 in counsel fees to "ten of the screen name [d]efendants and Heyer, together." R. 4:26-4. Judgment may not

be taken against fictitious defendants. Ibid.; Stegmeier v. St. Elizabeth Hosp., 239 N.J. Super. 475, 485 (App. Div. 1990).

For the foregoing reasons, we vacate the award of counsel fees and remand the matter to the trial court for entry of judgment in the amounts of fees paid to date, if any.

V.

To summarize, we reverse the summary judgment motion dismissing the claim set forth in paragraph 47 of the complaint and remand that claim for further proceedings. We reverse the judgment at trial dismissing the claim set forth in paragraph 87 of the complaint and remand that claim for trial. Last, we vacate the award of counsel fees and sanctions. To the extent we have not specifically addressed some of the parties' arguments, we have found them to be without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5668-14T4

**¶in**
**Complaint**

18     On June 8, 2011, Pincus posted the following on grafixavenger.blogspot.com:

GA thinks that Bajardi's egotism may have him believing he can outsmart the F.B.I. A friend told me I was nuts, he'd never be that stupid. But we both agreed that Mason would throw him under the bus in a nanosecond if it would shield her from prosecution in the F.B.I.'s developing criminal case. Is that what he's doing to her now in an F.B.I. interrogation room? Cutting his losses, trying to save his own skin? Or has he woven some elaborate, nutty story with Zimmer at the epicenter?... it depends on what the birdie sings.

22     On June 16, 2011, Pincus posted the following on grafixavenger.blogspot.com:

Lane Bajardi let out of his holding cell in Newark, all wired-up and no place to go- was there last night, dapper in a dark suit, excited to see me. So Excited he told the handsome, young gentlemen next to him who I was. That young man then stood up and snapped pic after pic of me with his cell phone from his side of the gallery…. Nothing I do is personal. Or intentionally cruel. (Except for Mason and Bajardi- and I freely admit it).

25     On June 11, 2011, Pincus posted the following on grafixavenger.blogspot.com:

Ricky Mason, as the Mason campaign Treasurer, should furnish copies of these checks to ELEC along with a list of street money recipients to correspond with those check numbers. And he should

---

[1]  We have not corrected any typographical errors or misspellings in the blogs as reproduced in the complaint.

explain why the coterie of Mason political operatives that (presumably) should be on her ELECs are NOT: Lane Bajardi.. How did they get paid?

28    On August 15, 2011, Pincus posted the following on the grafixavenger.blogspot.com:

Dear FBI,
How've you been? Sorry you haven't heard from me in a while. No, I'm not mad at you, I was on vacation. Have you had one this summer? Remember to bring your sunblock – 35 spf or higher. Do you burn or tan?

Listen I head you're hiring people from HOBOKEN.

That's ME! I know what you do and it looks like fun. I used to watch you on Kojak. Or was it Baretta? Hey, did that bird ever crap on your shoulder? I remember when Bush Jr. got crapped on at a Rose Garden press conference. Funniest thing I ever saw.
Back to the subject. I want you to hire ME. That's right.

I think I'd do a GREAT job. First of all, I've always wanted to shoot someone. I'd get a gun, right? Well I'd definitely use it. A lot. Maybe everyday. Bang, bang! Take that! Only do I ask questions first THEN shoot? Or shoot FIRST and ask questions later? I guess it's in the manual, rigt?

And I have a whole list of people to arrest… all within walking distance! One's on upper Hudson, another's on Park, one lives above a Pet Shop… I'm telling you, I'll just walk over at 6am and knock on their doors. And if they don't answer right away, I'll take out my gun and shoot the door knob (I get a gun, right?) And if they resist, I'll apply the Vulcan Death Grip- one squeeze and they're down.

So what do you think? I've got the goods right? As soon as we seal the deal I can start arresting. Look, I didn't want to hurt your feelings, but you're just taking TOO long. I'll get the job done in a jiffy.

A-5668-14T4

Then after the Paddy wagon takes off to Newark, how about we grab that falafel at Mamoun's? Do you like yours with hot sauce?

Sincerely,
Agent Grafix Avenger (sounds good)


On August 15, 2011, Pincus posted the following on grafixavenger.blogspot.com:

City Council regular for years, Beth Mason operative Lane Bajardi-famous for choreographed City Council performances coordinated with self-authored hit pieces in Hoboken411.com and scripted Mason outrage-has been MIA at public meetings. Severed from Hoboken411.com and neutered at the City Council, Bajardi has been lashing out on Patch and Hudson Reporter forums. To boot, he's ditched his 'known' screen names, commenting under a variety of new ones, with rants as identifiable as a finger print . . . .

Ha! It looks like I spoke too soon . . . the Mason checkbook seems to have flipped open to throw a certain cyber-slug a bone. Yes, he's published another putrid Bajardi screed.

FBI, they're at it again.

Persons-of-interest, enjoy the time you have left. Unshackled.

On November 7, 2011, Brice posted the following on Hoboken.patch.com:

Lane Bajardi is back. Still fighting for the corrupt and The Machine for his Beth Mason paycheck. Yawn.

Same ole, same ole.

A-5668-14T4

On November 9, 2011, Pincus posted the following on grafixavenger.blogspot.com:

Another point of note is the role of the "blogs" in the complaint, citing them as evidence of the political schism in Hoboken.

GA believes this points to Hoboken411.com, Perry Klaussen and Lane Bajardi for their handling of leaked emails and other leaked materials as part of the conspiracy.

On December 23, 2011, Pincus posted the following on grafixavenger.blogspot.com:

Then there's CuriousGal (Bajardi's Bridezilla) - who's NOT curious enough to know why her hubby's never appeared on a Mason ELEC or if that revenue stream has been reported to the I.R.S.

GA's heard the I.R.S. has given cash rewards to those who report tax cheats. Maybe CuriousGal can get us the answer: How to Report Suspected Tax Fraud Activity:
http://www.irs.gov/individuals/article/0,,id=106778,00.html
I hear the I.R.S. is curious about unreported income.

. . .

A real curious gal might want to know what happens to whose compensation for political campaign work goes unreported to the NJ Election Law Enforcement Commission and the I.R.S.

On January 13, 2012, Heyer, writing as ThisMeansWar, posted the following on hoboken.patch.com:

Has it occurred to Lane Bajardi that he may be looking at hefty prison time? He has NEVER appeared in an ELEC report for Beth Mason or Tim Occhipinti. He appears in this midnight video for Occhipinti's campaign leaders. . . . Is he credited in Beth Mason's IRS filings? Does he credit her in his tax forms? http://www.fbi.gov/news/videos/inside-the-fbis-internet-tip-line.

4

On January 18, 2012, Pincus emailed the following to Lane's employer:

Lane Bajardi is a hyper-partisan political operative who blogs under the screen name 'prosbus', and is now fomenting anti-Semitism in his latest effort to smear Hoboken's Jewish mayor, Dawn Zimmer.

As a Jew, I am offended and disgusted by this. As a well-known political blogger in Hoboken, I will be asking my community to reject Mr. Bajardi and his hate-mongering. I don't think your advertisers will appreciate a voice on your airwaves actively engaged in spreading bigotry and intolerance in the Hoboken community.

. . .

Here are (2) of Mr. Bajardi's posts attached, in case he has them deleted first[.]

On January 25, 2012, Pincus posted the following on grafixavenger.blogspot.com:

But if the St. Patrick's Parade Committee fired the opening salvo, it's been taken to the bottom of the swamp in the anti-Semitic rantings of political operative Lane Bajardi.

Bajardi posts as 'prosbus' on Patch; it's one of many screen names he uses. While GA mainly ignores the dreck that pours from him like a broken sewage pipe, his anti-Semitism can't be.

. . .

That's why Bajardi needs to use the Dirty Jew strategy. He's got nothing else. So he's peddling hate and prejudice. He and his

buddies are saying the (Jewish) mayor and her allies are anti-Christian, anti-Irish, anti-Italian, anti-(name your ethnicity).

On January 25, 2012, Pincus posted the following on grafixavenger.blogspot.com:

I had to laugh at the mournful post of Curious Gal, who does not deny being Kim Cardinal, the political operative wife of political operative Lane Bajardi (who has not denied posting as prosbus . . .

Mr. and Mrs. Melanoma, defenders of corruption, haters of the clean, progressive Kids First Majority School Board.

On January 27, 2012, Pincus posted the following on hoboken.patch.com:

Curious Kim Cardinal and gettheledout44 Bajardi. . . trashing the public schools has become your full-time occupation, hasn't it? Have the Russos adopted you yet? You are so protective of their buddy Al Arezzo. It's heartwarming how you care about Arezzo, but attack our public schools that your own child may be using in a year or two. What kind of parents are you? Trying to drive families away from public schools by trashing them 24/7. You could care less about your own kid, future public school student? Your hared [sic] of the mayor is more important than him. You 2 suck as parents. Somebody call DYFUS. [sic] The kid would be better off being raised by wolves. Poor thing.

On January 27, 2012, Pincus posted the following on hoboken.patch.com:

This Curious Cardinal MOTHER hates the mayor more than she looks out for the welfare of her own child. gettheledout44 Bajardi would rather trash the schools than support them for the sake of his young child. They suck as parents. Neither of these 2 nitwits, blogging for poor Al Arezzo, give a damn about our schools. They

should adopt Al Arezzo and change their last names to Russo. Their poor kid. Won't somebody call DYFUS? [sic] He'd be better off being raised by wolves.

On January 27, 2012, Pincus posted the following on hoboken.patch.com:

Certainly, Curious Kim Cardinal, I'd be delighted. It'll only cost you $1/word. Have one of your pimps write a check. But please, no bouncy ones. In fact, it has to clear before I post for you, since you are known to shill for criminals. Now, getting back to the subject, what kind of mother trashes her school district 24/7 for political patrons? You are a lousy parent. You have no interest in the school system in your child's community. A true disgrace. He'd be better off being raised by wolves.

On January 27, 2012, an unnamed defendant posted on hoboken.patch.com:

Well, have we just witnessed a confirmation by the shrew of the house that Curiousasshat and Pussface and their multiple [sic] mutations are in fact that uber employment challenged and not appearing on any ELECc [sic] reports couple Kim and Lane Bajardi?

On January 29, 2012, Pincus posted the following on hoboken.patch.com:

Kim Arezzo Cardinal Russo. You've made anything you and hubby have to say irrelevant with your defense of the '39 year civil servant' (Arezzo) and denial of past BoE corruption. You and hubby lack normal parental instincts, hating the mayor is more important than supporting the public school system for your own son. Somebody call DYFUS. He'd be better off being raised by wolves

7

On January 29, 2012, Pincus posted the following on hoboken.patch.com:

Let's see you and hubby run for the School Board, or volunteer in the schools, or run events like Minutillo, then you can bitch all you like. In other words, get off your nasty ass and do something for our community. Turning tricks for politicos may satisfy your ego, but you aint helping your kid. You're a miserable mother, attacking our schools for political masters. The kid would do better raised by wolves.

On January 30, 2012, Pincus posted the following on grafixavenger.blogspot.com:

hey GA, this smokestack on L*** Baj*rdi's penthouse apartment is a recent addition, maybe a couple of years old. . . . is this legal?

 . . .

Gee reader, this kind of thing is not my expertise. That would be the purview of the Construction Office.

And if this is several years old, GA believes the person who would have been inspected and approved smokestack is the Construction Code Official. That would be . . . Al Arezzo.

Curious Gal, anti-Zimmer operative, is a big Al Arezzo fan.

I bring that up because she is believed to be Kim Cardinal (has never denied it) the wife of 'prosbus' – believed to be Lane Bajardi (has never denied it). Take a look, in this Patch comment; she calls Arezzo a "knight" and "shamefully treated" and a victim of "bully tactics".

. . . .
And hubby 'prosbus' is a big Arezzo fan, too; calls Arezzo's termination "unlawful".

. . . .

My goodness, WHAT could inspire SUCH loyalty to the former Construction Code official?  Hmm. . .

I have no idea.

As for that smokestack, reader I think you need to contact the Construction Office:  Hours: M – F, 9 am – 4 pm, tel: (201) 420-2066.

The Acting Construction official is Thomas Shannon.  He's got to know this like the back of his hand.

. . . .

Does that smokestack look like its 4 feet below the window?

Really, one can't tell from a photograph.  Maybe prosbus or Curious Gal can measure it for us?

On February 3, 2012, Heyer, writing as ThisMeansWar, posted the following on galloway.patch.com:

VinVan, Prosbus, Curiousgal (and other names they may use as the night goes on) are the husband and wife PAID OPERATIVE team of Lane Bajardi and Kim Cardinal.  Bajardi and Cardinal are extremely closely aligned with (PAID BY) the political machine in Hoboken.  You can rather quickly and easily verify that yourselves. . . . You may recall from FBI surveillance tapes where [Russo] accepted a bribe from Solomon Dwek and told Dwek to make it out to RussoForHoboken.  Bajardi and Cardinal have spent many an hour defending Mr Russo's behavior. . . . Ms Mason is the exceeding wealthy bankroller of smear campaigns against political enemies (many of which were penned by Mr Bajardi).  . . .  She has spent millions in her own (husband's) money in a failed quest to get elected

mayor (much to the chagrin of Mr Bajardi who would have been her Public Information Officer). . . .

84      On February 3, 2012, Pincus posted the following on galloway.patch.com:

I live in Hoboken. We have a sickness living amongst us- his name is Lane Bajardi and his wife is Kim Cardinal. Here they are posting as: VinVan, Curious Gal, prosbus, OutofControl. Both of them work in the media- Bajardi is an anchor with 1010WINS radio. They are very sick people-Bajardi was actually arrested for assaulting a local blogger and stealing his camera. . . These two run smear campaigns on anyone affiliated with Mayor Dawn Zimmer. And they are sick people. Undiagnosed, with serious personality disorders. I was no surprised to find out that they were smearing Ach Liston, and EXCEPTIONAL Business Administrator. Do your best to ignore these 2- we call them Mr. and Mrs. Melanoma. I'm a blogger and political activists, and also a frequent target of these 2 malevolent creatures. Do contact me with questions: grafixavenger666@gmail.com http://grafixavenger.blogspot.com/.

87      On February 3, 2012, Pincus posted the following on galloway.patch.com:

Curious Gal (Kim Cardinal) is a hideous political operative whose husband has worked for years on the campaigns of a wealthy local Councilwoman named Beth Mason. , yet Bajardi has NeveR appeared on a Mason an ELEC report-meaning perhaps lots of undeclared income to the IRS. Oops!

. . . Mr. Bajardi, blogging here as VinVan has been questioned by the FBI, and is believed to be part of the criminal conspiracy to steal our mayor's e-mail and trafficking in confidential city information. A friend of Bajardi's named Patrick Ricciardi, has been arrested. More

arrests will follow.  Don't be surprised if you read about him in the paper. . . .

90    On February 11, 2012, an unnamed defendant posted on grafixavenger.blogspot.com:

Every few minutes Kim Cardinal pokes her head of the bunker and runs up the flag for her doomed campaign of lies an [sic] misdirection. She immediately gets buried in an artillery barrage of easily verified facts and figures. Only by standing up and saying 'my side is lying' could she be having a worse net impact. Is there any chance she comprehends that? OR that the people who are paying for this nonsense 'get it'*?*

93    On March 2, 2012, Heyer, writing as ThisMeansWar, posted the following on hoboken.patch.com:

Well it looks like Prosbus-hq is back so it's time for today's PSA. PUBLIC SERVICE ANNOUNCEMENT Paid liar Lane Prosbus-hq . . Paid liar Kim CuriousGal . . . Additionally PAID LIAR Lane has a HISTORY of VIOLENCE and getting ARRESTED at BOE meetings . . . Don't waste your time listening to PAID LIARS and THUGS.

96    On March 4, 2012, Heyer, writing as ThisMeansWar, posted the following on hoboken.patch.com:

Now what about your child? Have either of you losers EVER thought about the damage you are doing to him? … But he will be the kid who is KNOWN the second he walks through the doors of ANY schools [sic] as the progeny of you two hateful people. Children are cruel. You are digging and [sic] awful hole for that child. Fairly or not he will be punished for the sins of the father. And mother. Stop thinking about how badly you want to hurt everyone

11

associated with Zimmerman and reform, and start thinking about how BADLY you are hurting your own child.

99    On March 12, 2012, Pincus posted the following on grafixavenger.blogspot.com:

GA takes a special interest in one member of the trio: the 'on-air personality' who works for the AM radio station 1010WINS. The corporate owner of 1010WINS is CBS.

103   On March 16, 2012, Pincus posted the following on grafixavenger.blogspot.com:

Guess WHO showed up to . . . umm . . . defend the person he's not supposed to be- at least according to the corporate owner of 1010 WINS, CBS? Prosbus.

…was Lane Bajardi unwittingly used to aid and abet the corruption of Hoboken's zoning adjustment authority or was he Cammarano's willing pitchman in his corruption?

Now that we've discovered his alliance with Cammarano for control of the zoning adjustment authority (which Cammy sold to Dwek just days earlier) it puts Bajardi's lust for my seat in its proper perspective; ingratiating himself with corrupt and powerful individuals is what it's been about.

Today, prosbus is in a bit of a bind. He can't 'defend' or 'explain' the actions of Lane Bajardi without stepping out from behind his screen name.

A-5668-14T4

On May 29, 2012, Heyer, writing as JackStop, posted the following on nj.com:

http://3.bp.blogspot.com/-HJ2tPQHSFoE/T2NdUn8S77I/AAAAAAAACBI/KquYD6CgRc/s1600/cammarano+bajardi.jpg.     Future convicted felons Lane Bajardi & Kim Cardinal sucking up to soon-to-be convicted felon Peter Cammarano like a pair of remoras.

On June 8, 2012, Brice, writing as  hobokenhorse, posted the following on hoboken.patch.com:

No matter what Beth Mason's other paid political operative Lane (prosbus/Madison Monroe/et al) Bajardi has to say about his fellow Mason paid political operative Matt Calicchio, the judge's comments speak for themselves even if the prosecutor lacked evidence for a conviction.

On June 13, 2012, an unnamed defendant posted on hoboken.patch.com:

Here's the problem, CuriousKim. You're trying to ruin the schools in Hoboken and live in Edgewater. Id on't care what it's called, cyber-bullying, hypocrisy, whatever – it's nasty. Perhaps you should stop. http://i46.tiny pic.com/zvvgqq.jpg."

Brice allegedly posted on Hobokenhorse.com plaintiffs moved from Hoboken to Edgewater.

On June 11, 2012, Pincus posted the following on hoboken.patch.com:

It appears I've hit a nerve with Curious Gal / Kim Cardinal.  About hubby prosbus/Lane Bajardi never appearing on an ELEC report, and ALL of that unpaid tax-income you 2 may owe the IRS?  Is the IRS a bully, too?  How has Bajardi been paid all these years?

A-5668-14T4

. . .

It looks like taxpayers were funding Mason's 501(3)(c) political operative employment agency. Are CG and prosbus on the 501(c)(3) dole, too? Is that why she's so angry now?

On June 23, 2012, Pincus posted the following on grafixavenger.blogspot.com:

CONSPIRATOR B: The political operative who posts online under many different monikers, but mostly as Curious Gal and prosbus, and has never denied she is Kim Cardinal. Cardinal is the current (or former) wife of 1010WINS cabby-crooner Lane Bajardi. Cardinal has not denied she's moved out of Hoboken to a waterside development in Edgewater. Curious Kim has been the Energizer Bunny of this conspiracy to seed Patch with closed-session allegations- which cannot be debated or refuted because they are closed session. This is Cardinal's modus operandi-planting ugly rumors online, lies and spin, against those she perceives as 'enemies'. All disturbing, and in his case, her victim is an African American. The vigor and venom with which Curious Gal has pursued this individual with unethically-obtained information NOT AVAILABLE BY OPRA REQUEST suggests a very dark motive driving her animus toward this African American professional.

On July 18, 2012, an unnamed defendant posting as Napoleon Complex posted on hoboken.patch.com:

I say Mayor Zimmer is responsible for driving Kim Cardinal to Edgewater and Little Lane B into hiding. Something most people look at as a HUGE positive for the town. 2 of the biggest POS's the town has ever encountered.

On July 19, 2012, an unnamed defendant posting as Hoboken1653 posted the following on hoboken.patch.com:

I feel nothing but pity for CuriousGal Kim. Her marriage is in shambles and she is living in exile in Edgewater. Her husband once again took what he felt his allotted pizza was and left.

Alleges defendants posted defamatory comments concerning plaintiff as: Bet Mazin, KlaussenFluffer, InfotainMe, SmartyJones, Bludiamonds, JAM, Redrider765, plywood, davidd, ss1959, Hobbs, and Bob R.

A-5668-14T4